**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TREASURE LAKE, INC., a subsidiary of Great Northern Development Co., Inc., Respondent.**

**No. 71–1105.**

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 1971.

Decided Dec. 21, 1971.

Allen Cirker, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Attys., N. L. R. B., on the brief), for petitioner.

William U. Smith, Clearfield, Pa. ·(Robert R. Marsh, Clearfield, Pa., on the brief), for respondent.

Before GANEY, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

The National Labor Relations Board has applied to this court for enforcement of its order finding respondent Treasure Lake, Inc., in violation of Sections 8(a) (1) and (3) of the National Labor Relations Act (29 U.S.C. §§ 158(a) (1) and (3)) for creating an impression of surveillance of its employees' union activities and threatening to fire them for the exercise of their right to organize under Section 7 of the Act (29 U.S.C. § 157). The Board's decision and order are reported at 184 N.L.R.B. No. 74 (1970). The Labor Board also found that fourteen employees of the company were discharged for union activity and asks us to enforce the part of the order requiring the company to make these dismissed employees whole. Respondent Treasure Lake contends that there was no substantial evidence for the Board's findings and that it was improper for the Board to disagree with its Trial Examiner over certain inferences to be drawn from the testimony taken at the unfair labor practice hearing.

Treasure Lake is a development being built near DuBois, Pennsylvania. In the spring of 1969 it hired a crew of approximately thirty men to clear brush and trees and prepare the various construction sites on the property. The men were promised steady employment for a period of several years and an increase in wages after thirty days. The promised increase was not forthcoming, and the disgruntled workmen began talking about joining a union.

Shortly after these discussions began in the early part of June, the company's foreman, Glenn Bundy, told several workers that he was patrolling the grounds at night because he had heard "that the union was coming in." Notwithstanding the not-so-veiled threat of employer opposition to unionization, several workers, including one George Gould, contacted Local 66 of the International Union of Operating Engineers for information about how they could organize their work site. A union representative suggested that the group get the names of all those employees who were interested in joining so that they could be contacted directly by the union.

On the morning of June 20 shortly after signing in for work, but before instructions for the day's activities were issued, Gould had thirteen other men in his crew sign a sheet for the union. The company's coordinator of construction, Duggins, learned about the signings from one of the workers, and ordered foreman Bundy to discharge Gould immediately. Bundy told Gould that he was being fired for his union activities, and repeated the same story to several other workers later the same day. He also told them he intended to "get" the other employees who were involved.

At the same time Bundy announced that there would be a meeting for all the men on the crew at the end of the day when paychecks were to be handed out. One employee claims to have known about the meeting approximately a week in advance, but it took the rest of the crew by surprise. At the meeting Duggins seems to have mentioned something about the union organizing and that the company was opposed to it. Then, he announced that there would have to be a cutback in the work force, and that thirteen men were to be fired. Ten of the thirteen had signed the list that morning, and all of them were told they were dismissed permanently. The other three were simply told they were fired. Only one of the thirteen was ever rehired.

The Trial Examiner found that Gould's dismissal was in violation of Sections 8(a) (1) and (3) of the Act, but failed to find any other illegal activity. The Board accepted the Trial Examiner's findings, but drew different inferences from the proceedings. They found the statements about patrolling the grounds for fear of union activity were clear pronouncements of the company's anti-union policy at a time when the workers were beginning to organize. The statements on June 20th were considered clear threats of reprisal. Final-

ly, they found that the Trial Examiner had given undue weight to Duggins' testimony that he had already planned the lay off, citing the failure of the company to show that the list had been prepared in advance of June 20th and the suddenness with which the meeting was called after Gould was discovered passing around his list. The Board granted a cease and desist order and a make whole order for all these violations.

■ We must enforce the Board's order if we find that there was a substantial basis for its findings. Universal Camera v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950). While the Trial Examiner's estimation of the credibility of witnesses should be given great weight by both the Board and a reviewing circuit court, NLRB v. Hamilton Plastic Molding, 312 F.2d 723, 727 (6th Cir. 1963), his determinations are not final. If the Board finds that the Trial Examiner's position is incorrect and that there is substantial evidence for a contrary conclusion, it may reverse. If we agree that there is substantial evidence for the Board's final decision, we have no choice but to enforce its order. Rocky Mountain Natural Gas Co. Inc. v. NLRB, 326 F.2d 949, 951 (10th Cir. 1964); NLRB v. Supreme Bedding and Furniture Mfg. Co., 196 F.2d 997, 998 (5th Cir. 1952).

■ After a thorough review of the record, we conclude that there is such substantial evidence to sustain all of the Board's order. There is no doubt in our minds that Gould's firing was directly related to anti-union bias on the part of the company. As for the rest of the Board's order, which was in disagreement with the Trial Examiner, it should be pointed out that the Board accepted all of the examiner's findings of fact. It merely drew different, and we think justifiable, inferences from those facts. A statement from a supervisor to an employee that the company was using guards to patrol property because a "union is coming in" assuredly connotes anti-union sentiments. It is difficult to think why the management would go to the trouble of a night patrol if it did not have clear and strong sentiments against organization. The subsequent communication of those sentiments to its workers could leave no doubt in their minds about the company's determination to resist any organizational efforts.

The activities on June 20th also leave the unmistakable impression that a prime element behind the company's actions was a desire to resist all efforts at unionization and to punish those workers who had attempted to exercise their rights. Bundy's statements that the company would find out and fire all those who signed the list are clear threats of reprisal that the Board properly found violated the Act. As for the firings, while the Trial Examiner was free to evaluate the oral testimony given at the hearing, we believe that the Board had a substantial basis for concluding that the firings were related to the employees' organization activities.

The dismissals, coming immediately upon the discovery of the union list, raise a strong inference that they were reprisals, despite Duggins' protestations that they had an economic motivation. Duggins never supplied any information that would have led the Trial Examiner to conclude that he had planned the lay off for economic reasons before the discovery. In the absence of such information, which is particularly within the ken of the company, the Board and the courts have found that there is an implication that if the evidence were produced, it would be adverse to the company. NLRB v. Wallick, 198 F.2d 477, 483 (3d Cir. 1952).

In addition, there is a remarkable coincidence between those fired and those who signed the list. The company supplied no adequate explanation, again raising an inference that there was no such legal explanation. Majestic Molded Products, Inc. v. NLRB, 330 F.2d 603, 606 (2d Cir. 1964). The Board also properly noted that there was no explanation for the absence of any prior announcement of the drastic cutback that laid off half the work force. All of

these doubts were buttressed by the testimony of employees that Bundy had told them he was going to "get" the rest of the people involved in union activity. With facts as clear as these, the Board was justified in relying on circumstantial evidence and the implications arising therefrom notwithstanding Duggins' statement. NLRB v. Melrose Processing Co., 351 F.2d 693, 698 (8th Cir. 1965); NLRB v. G. & J. Co., Inc., 346 F.2d 960, 961 (3d Cir. 1965); NLRB v. Buitoni Foods Corp., 298 F.2d 169, 174 (3d Cir. 1962).

The order of the Board will be enforced.

Biggs, Circuit Judge, concurred and dissented and filed opinion.