**GARRETT RAILROAD CAR & EQUIPMENT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, AFL–CIO and its Local 8089, Intervenor.**

No. 81–1775.

United States Court of Appeals, Third Circuit.

Argued March 3, 1982.

Decided June 29, 1982.

Robert D. Weisman (argued), Schottenstein, Zox & Dunn, A Legal Professional Ass'n, Columbus, Ohio, Timothy P. O'Reilly, Morgan, Lewis & Bockius, Philadelphia, Pa., for petitioner.

Howard E. Perlstein, John P. Coyle (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for respondent.

Rudolph L. Milasich, Jr., Asst. Gen. Counsel, Carl B. Frankel, Associate Gen. Counsel, United Steelworkers of America, Pittsburgh, Pa., for intervenor; Bernard Kleiman, Chicago, Ill., of counsel.

Before HUNTER, WEIS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Garrett Railroad Car and Equipment, Inc. (Garrett, or the company) petitions for re-

view of an Order entered by the National Labor Relations Board adopting and modifying a recommended order of the administrative law judge (ALJ). The NLRB crossapplies for enforcement of its order.

Upon consideration of the opinions of the ALJ and the NLRB, the notes of testimony from the hearing and the briefs and oral argument before us, we will enforce the ALJ's recommended order and reject the modifications ordered by the NLRB. To the extent that Garrett's petition for review seeks a result inconsistent with the ALJ's recommended order, it will be denied.

### I.

Garrett is engaged in the manufacture, repair and distribution of railroad cars and related products at its facilities in New Castle, Pennsylvania. Since 1973, Garrett's production and maintenance employees have been represented in collective bargaining by Local 8089 of the United Steelworkers of America, AFL–CIO. Prior to the negotiations and eventual strike which gave rise to the disputes in this case, the conditions of employment at Garrett were governed by a three-year collective bargaining agreement set to expire on March 31, 1979. When an agreement could not be reached by March 31, the union continued to work until April 25 at which time a strike was called in support of the union's demands.

On July 25, Garrett circulated a letter to the strikers summarizing its bargaining position and announcing its intent to replace those strikers who were unwilling to return to work. Two months later on September 27, Garrett discharged 11 strikers for alleged misconduct. Three of those discharged, Main, Vannatten and Senchak, are the subjects of the unfair labor practice charges in this case.[1]

During the strike the union continued to bargain with Garrett and on September 28 agreed to submit Garrett's proposal on con-

---

1. The General Counsel did not challenge the discharge of the remaining eight strikers fired on September 27.

tract terms to the rank-and-file for ratification. The membership meeting was called for Sunday, September 30. Arrangements were made between Garrett's counsel, James Ferber, and the union representative, Clarence Mannarino, for Mannarino to phone Ferber at home on Sunday after the vote. Ferber testified that he advised Mannarino that a written summary would have to be prepared if the membership ratified the company's proposal. Mannarino, in turn, agreed to call the strike off at the point of ratification. The membership accepted the proposal. The ALJ described what occurred when Mannarino called Ferber:

> However, when Mannarino called during the evening of September 30 to announce that the members had ratified the agreement, that the strikers were ready to go back to work, and that he wanted an immediate meeting to sign a summary agreement, Ferber asserts that he told Mannarino that this could not be done because, Ferber stated, the parties had not come to a full agreement on the contract issues. Mannarino disputed this, asserting that they had come to full agreement.

ALJ's Opinion, App. at 250. Nevertheless, October 3 was set as a date for the parties to meet in Ferber's office and the union agreed to cease picketing on that date.

On the day before the scheduled meeting in Ferber's office, Garrett's management received a petition signed by 67 of the 108 employees stating their desire to no longer be represented by the Steelworker's Union.[2] Ferber called Mannarino on the second of October and asked that the meeting set for the third be postponed until the eighth as Ferber had a scheduling conflict. Mannarino agreed to the postponement and the strike was called off as promised on October 3. Mannarino then received the following letter on October 5:

> This letter is to advise you that the Company has received a petition signed by a majority of our employees in which they stated that they do not wish to be represented any longer by the Steelworkers for collective bargaining or any other purposes. In view of this petition, the Company has no choice but to go along with the desires of a majority of our employees. Accordingly this letter is to advise you that the Company is withdrawing recognition from the Steelworkers as the collective bargaining representative of our employees.

The October 8 meeting did not occur and the parties neither met nor executed a document summarizing the ratified proposal.

The union filed unfair labor practice charges against Garrett on October 19 and amended its complaint on December 21. The union's complaint is comprised of three basic allegations. First, it alleges that Garrett violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (the Act) by inducing its employees to sign the petition disavowing membership in the union. Second, it asserts that the discharges of Main, Vannatten and Senchak were in violation of §§ 8(a)(1) and (3). Finally, the union claims that Garrett violated §§ 8(a)(5) and (1) by refusing to acknowledge, reduce to writing, execute or be bound by the agreement reached between the parties and by withdrawing recognition from the Steelworkers.

After three days of hearings conducted on April 28, 29 and May 6, 1980, the ALJ recommended that Garrett cease and desist from refusing to recognize the Steelworkers and from refusing to reduce the agreement to writing. The ALJ also recommended that Main be reinstated with back pay and the dismissals of Vannatten and Senchak be sustained.[3] The NLRB adopted the ALJ's

---

2. The full text of the petition reads as follows: We the following undersigned employees, with your help and approval, no longer wish to be represented by the U.S. Steelworkers Union or any other existing union. Instead, we would prefer to be represented by an

in-plant committee with a representative from each department.

3. The full text of the ALJ's Order is as follows: Garrett Railroad Car & Equipment, Inc., Respondent herein, its officers, agents, successors and assigns, shall:

proposed Order with the modification that both Vannatten and Senchak also be reinstated with full back pay.

## II.

### A. The Contract Issue

█ The ALJ's opinion reviews extensively the factors leading to his conclusion that the parties intended Garrett's proposal of September 28 to become a binding contract once ratified by the union membership. The ALJ explained that:

Based on all the testimony, there is no question in my mind but that at the end of the session on September 28, both the Respondent and the Union considered that they had arrived at a meeting of the minds on a complete bargaining agree-ment. There are several factors, in particular, that are convincing. Thus all the parties are agreed that at the end of the meeting on that day it was understood that the Union would take the matters agreed or offered by Respondent back to the membership for ratification, and that if ratified, the strikers would call off their strike. It was further understood that the Union would call Respondent counsel at his home on Sunday if the agreement was ratified, and that in that case, it would be necessary to draw up a summary agreement. It is most unlikely in the extreme that these expectations would be held by both parties unless they understood that the Union would be voting on a final agreement which would end the strike which had been in progress

1. Cease and desist from:

(a) Inducing, encouraging, and aiding employees in the circulation of petitions to disavow United Steelworkers of America and its Local 8090, AFL–CIO–CLC, the Union herein, as the exclusive bargaining representative of its employees in an appropriate bargaining unit.

(b) Withdrawing recognition from and refusing to bargain with the Union as the exclusive bargaining representative of its employees in an appropriate unit.

(c) Refusing to reduce to writing, execute, and abide by the terms of the collective bargaining contract agreed between Respondent and the Union on September 28, 1979.

(d) Discharging or refusing to reinstate employees for engaging in concerted activities protected by Section 7 of the Act.

(e) In any other manner interfering with, coercing or restraining employees in the exercise of rights guaranteed under Section 7 of the Act, including the right to free choice with respect to representation for the purposes of collective bargaining.

2. Take the following affirmative action which it is found will effectuate the policies of the Act:

(a) Upon request bargain collectively with the Union with respect to wages, hours and conditions of employment of the employees in the following appropriate unit: All production and maintenance employees employed by Respondent at its Cherry Street, New Castle, Pennsylvania facility, excluding clerical and technical employees, and guards, professional employees and supervisors as defined in the Act, and embody any understandings reached in a written signed agreement.

(b) Upon request, forthwith reduce to writing, execute, and honor and abide by the terms of the agreement between Respondent and the Union reached September 28, 1979.

(c) Offer Fred Main immediate and full reinstatement to his former position, or if that position no longer exists, to a substantially equivalent position and make him whole for any loss of earnings or benefits he may have suffered by reason of his discharge, in accordance with the provisions set forth in the section hereinabove entitled "The Remedy."

(d) Preserve, and upon request make available to the Board or its agents for examination and copying all payroll records, social security payment records and reports, and all other records necessary to facilitate the effectuation of the Order herein.

(e) Post at its operations at New Castle, Pennsylvania, copies of the attached notice marked "Appendix." Copies of the notice, on forms provided by the Regional Director for Region 6, after being duly signed by Respondent's authorized representative, shall be posted by the Respondent immediately upon receipt thereof, and be maintained for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material.

(f) Notify the Regional Director for Region 6, in writing, within 20 days from the date of this Order what steps Respondent has taken to comply herewith.

IT IS FURTHER ORDERED that as to alleged violations of the Act not found hereinabove in this Decision the complaint be and it hereby is dismissed.

Dated, Washington, DC

October 15, 1980

for 5 months. Respondent seems to suggest that the Union was taking a partial package to the employees for approval or disapproval, as the Union had done on other occasions during the negotiations. However, it is not credible, on this record, that the Union would be talking about calling off the strike for less than a complete contract, or that the parties would consider it necessary to call counsel at home on Sunday evening to report acceptance of some parts of, but less than all of an agreement, rather than waiting for the next bargaining session to report what was accepted and what rejected. Finally, it appears that the parties did not contemplate another negotiating session of the kind to which they were accustomed, at a neutral place, with full bargaining committees, and mediators in attendance.

We are in agreement with the ALJ's conclusion and find more than substantial evidence on this record to support his findings of fact.

The company argues that there were four areas yet to be resolved when the proposal was ratified. The alleged open issues were: (1), the effective dates of the contract as they related to a retroactive wage increase and increases in the second and third years; (2), union counter-proposals; (3), work rules; and, (4), an incentive bonus plan. The ALJ addressed each of these contentions and, again, we have concluded that there is substantial evidence to support his analysis on each point.

Regarding effective dates, the ALJ noted that the parties had three issues to resolve: the effective date of the contract; the retroactivity of the wage increase in the first year; and, the dates in the second and third years when wage increases would become effective. The union agreed to limit wage retroactivity in the first year to April 25, the date on which the strike began. During the September 28 meeting with Ferber, Mannarino requested that April 1 be considered the effective date of the contract. Ferber's testimony before the ALJ revealed his acceptance of the April 1 date. He testified as follows:

> So at this point, I was totally confused as to what the effective date was, and ... I asked him [Mannarino]. I said "Now, do you want the effective date from April 1, 1979 to March 31, 1982? Is that your position right now?" He said, "Yes." ... I said, "Is your position related to wages?" "Yes." And I said, "But not to other things in the agreement?" "Yes." "Okay," I said, "if the contract is ratified we're going to have to prepare some kind of a summary."

Thus, Ferber agreed to April 1, 1979 as the effective date for the purpose of wages and let stand the earlier agreement that retroactivity would extend back only to April 25.[4] As to the second and third year wage increases, they were understood to be effective on the anniversary of the contract. That was precisely the pattern of past contracts between the parties and when Ferber was advised by the federal mediator that he had not expressly altered this practice, he chose to make no further mention of the issue. We agree with the ALJ that this fact is probative of Ferber's intent to have April 1 be the effective date for the second and third year wage increases.

There is no merit in the company's allegation that the union's counter-proposals and work rules remained as unresolved issues. Of course when the company placed its final proposal before the union for ratification, it was understood by the union that its earlier positions, not included in the latest package, would be abandoned in any af-

---

4. This result makes sense in the normal course of industrial relations as we understand it. By agreeing to an effective date for the purposes of retroactivity that coincides with the commencement of the strike, the company in effect was limiting its obligation to increase the strikers' pay to the date on which each worker returned to his or her job. This is so because ordinarily in an economic strike the strikers receive no wages from the employer for the period which they are on strike. Mannarino understood this and informed the membership at the ratification meeting that their first year wage increases would not take effect until they returned to work.

firmative ratification vote. As to the work rules, the parties had reached agreement on each rule and Ferber so testified.

Finally, the company contends that there were open issues relating to the mechanics of the company's buy-out of the incentive bonus plan. The 1976–1979 bargaining contract included an incentive bonus plan for employees working in Garrett's car shop. The company desired to eliminate the plan and bargained for a lump sum amount to be distributed to the car shop employees in return for their giving up the plan. The ALJ found that on September 28, the parties settled on the amount of the buy-out sum and the proportionate scale for distribution to the appropriate employees. The General Counsel argued and the ALJ accepted the inference that the company raised this objection "as a last minute afterthought designed to avoid the bargaining contract to which [the company] had agreed." There is substantial evidence on the record to support the finding that the parties reached agreement on this issue and to support the ALJ's inference.

■ While we are reluctant to endorse bargaining agreements between sophisticated parties with a substantial labor history that have not been reduced to writing, we note that neither the statute nor the case law strictly requires a writing for enforceability. See § 8(d), 29 U.S.C. § 158(d) (collective bargaining includes the duty to execute "a written contract incorporating any agreement reached if requested by either party"); see also Heinz v. NLRB, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941); NLRB v. Haberman Construction Co., 641 F.2d 351 (8th Cir. 1981) (en banc); NLRB v. Electra-Food Machinery, 621 F.2d 956 (9th Cir. 1980); NLRB v. New York-Keansburg-Long Branch Bus Co., Inc., 578 F.2d 472 (3d Cir. 1978). Nevertheless, where a collective bargaining agreement has expired and a strike has occurred and the company submits a complete and final proposal which is ratified by the union's rank-and-file, resulting in the end of the strike, we agree with the Board and the ALJ that the company violated the Act by refusing to reduce the agreement to writing.

B. *The Union's Purported Loss of Majority Status*

■ Garrett claims that the union lost its majority at two separate points in time, and as a consequence, the company had no duty to enter into a contract with the union. First, it claims that the union lacked majority status as of September 17. At that time, the number of new employees hired as replacements for strikers plus the number of regular employees not on strike exceeded the number of workers on strike. The company reasons that this fact demonstrates the absence of a union majority.

This argument is unpersuasive. There is no presumption that an employee who refuses to join or who crosses a picket line has abandoned his or her support for the union. *NLRB v. Frick Co.*, 423 F.2d 1327 (3d Cir. 1970). Thus, Garrett cannot argue that on September 17, it had a good faith doubt as to the union's majority status.

Garrett's good faith doubt, if it exists at all, must rest on the petition its management received on October 2. The petition, as already noted, was signed by 67 of 108 employees and asserted their interest in being represented by an in-plant committee. The ALJ relied on two grounds for his conclusion that the October 2 petition did not give rise to a good faith belief by Garrett of the union's loss of majority. First, the ALJ found that the October 2 petition was tainted by certain activities of the company's management taken in support of the petition. Second, the ALJ concluded that the existence of a valid contract as of September 30 precluded the company from denying recognition to the union during the term of the collective bargaining agreement.

■ There is more than ample evidence on this record to support the ALJ's conclusion that the October 2 petition was tainted by the company's illegal conduct. The ALJ found that the petition drive occurred principally, if not entirely, on the company's plant premises. In spite of the company

Vice President's admonition that the petition was to be circulated on the employees' own time, the shop superintendent allowed employees to use the company lunchroom and to stay and sign the petition rather than return to work at the end of their break. The superintendent advised the Vice President of this activity but no disciplinary action was taken.

Most damaging to the company's allegation of good faith was the credited testimony of Michael Egbert, a former employee of Garrett. He testified that most of the employees, himself included, left the lunchroom at the end of the break without signing the petition. Outside of the lunchroom a conversation occurred between some of the employees and the superintendent. Egbert said the superintendent suggested that the employees sign the petition or they "would more than likely lose [their] jobs." Egbert then returned to the lunchroom and signed only his first name to the petition. A second superintendent made similar statements to other employees which the ALJ found to have encouraged reluctant employees to sign the petition.

██ Substantial evidence in the record supports the ALJ's and the Board's conclusion that the petition was tainted. The two superintendents actively encouraged the petition, threatened employees, and allowed the company's time and premises to be used in its support. The company's Vice President was at least aware of the use of company time and premises and took no measures designed to demonstrate the company's neutrality. Under these circumstances, the company cannot rely on the petition as a basis for refusing to reduce to writing a contract already agreed upon with the union.

We need not reach the second basis for the ALJ's conclusion that the union did not lose its majority status. It is an interesting question whether an oral agreement, yet to be reduced to writing, can bar an employer from refusing to recognize a union. *See Pick-Mt. Laurel Corp. v. NLRB*, 625 F.2d 476 (3d Cir. 1980); *General Cable Corp.*, 139 NLRB 1123 (1962); *Appalachian Shale Products Co.*, 121 NLRB 1160 (1958). Under the traditional "contract-bar" rule, a written contract is required to bar a subsequent election petition. There is, as yet, no clear rule as to whether an oral agreement might serve to bar an employer from refusing to recognize the union with which it has agreed. Because we have concluded that the petition was tainted, we will leave open whether the same policies which support the "contract-bar" rule when there is a writing would also apply in these circumstances to make the company's withdrawal or recognition unlawful.[5]

## III.

### *THE INDIVIDUAL DISCHARGES*

As already noted, 11 strikers were fired for various incidents which occurred during the strike. The General Counsel challenged the discharges of only Timothy J. Vannatten, Anthony Senchak and Fred Main. The ALJ recommended that Vannatten and Senchak's discharges be upheld and that Main be reinstated. The board unanimously endorsed the ALJ's recommendation as to Main, unanimously rejected Senchak's discharge, and split 2 to 1 in favor of reinstating Vannatten.

### A. *FRED MAIN*

██ Fred Main was fired because Garrett alleged that he, along with another striker, had attempted to flatten the tires of a truck with a board embedded with nails. The evidence was clear that the other striker did attempt to flatten the tires but that Main was 5 to 10 feet away from

---

5. In *Pick-Mt. Laurel*, we noted the tension between " 'preserving employees' free choice of bargaining representatives, and providing stability for established bargaining relationships." 625 F.2d at 489, *quoting NLRB v. Frick Co.*, 423 F.2d 1327, 1332 (3d Cir. 1970). When the contract is written the balance clearly tips to the side of established bargaining relationships. In the present case, the ALJ was of the opinion that, absent unusual circumstances not found here, the overall goals of industrial peace would best be served by respecting the oral agreement.

the truck when the incident occurred. Furthermore, a film of the incident made by Garrett apparently showed Main holding a board without nails in it. Inasmuch as the only charge against Main was that he attempted to flatten the truck's tires and the evidence clearly demonstrated that Main did not participate in the incident, we will enforce the Board's finding of an unfair labor practice against the company for discharging Main.[6]

## B. *ANTHONY SENCHAK*

■ Senchak was fired for allegedly threatening to "get" a member of Garrett's management and for attempting to run a truck off the road after it had left Garrett's plant. The Board rejected the ALJ's recommendation that Senchak's dismissal be upheld after concluding that there was no evidence on the record to support the ALJ's conclusion. We do not agree. There is more than substantial evidence to support the ALJ's conclusion and we decline to enforce the Board's order insofar as it requires the reinstatement of Senchak.

The ALJ found that as the truck left Garrett's premises, Senchak followed it on his motorcycle. In the words of the ALJ, "Senchak and two other strikers on motorcycles drove in front of and around the truck and the car [containing members of Garrett's management personnel] in such a fashion as to impede and interfere with their safe use of the highway, finally causing the truck and the car to pull off the road at a commercial establishment...." The police were called, but before they could arrive Senchak and the other motorcyclists left.

The ALJ heard testimony from the driver of the truck and from the Garrett employees following in the car. Senchak also testified. The ALJ, after weighing the credibility of all the witnesses, concluded that Senchak's misconduct was serious and that his asserted justification was neither relevant nor credible.[7]

■ We fail to see how the Board could conclude that there was no evidence in the record on which the ALJ could rely to support his conclusion. We recognize that the Board is not obligated to accept an ALJ's findings of fact when there is substantial conflicting evidence on the record in derogation of the ALJ's findings. *NLRB v. Duquesne Electric and Manufacturing Co.*, 518 F.2d 701, 704 (3d Cir. 1975); *NLRB v. Treasure Lake, Inc.*, 453 F.2d 202, 204 (3d Cir. 1971). Nevertheless, if the Board declines to follow an ALJ's finding and makes a contrary finding, the Board's finding must be supported by substantial evidence. *Duquesne Electric*, 518 F.2d at 704. As the Supreme Court noted in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951):

> We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.

The Supreme Court's admonition is particularly applicable here. The ALJ carefully marshalled and weighed the evidence, in-

---

**6.** The ALJ properly noted that even a good faith belief by company officials cannot justify a discharge if the facts do not bear out the allegations which form the basis of the firing. *See NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

**7.** Senchak argued that he believed the truck had knocked down a striker on the picket line and he was merely following the truck until the police could take over. We accept the ALJ's judgment that Senchak's story is not credible and agree with the ALJ's further conclusion that, even assuming the truth of the story, it would not justify Senchak's antics on the highway. *See Chevron*, Slip Op. at 4 and cases cited. The ALJ did not reach the issue of Senchak's alleged threat to get one of Garrett's supervisors as the evidence of misconduct relating to the truck incident was overwhelming.

cluding the demeanor and credibility of the witnesses, and reached a sound conclusion. The Board in rejecting the ALJ's findings has arrived at a result that is not supported by substantial evidence on this record.

### C. TIMOTHY J. VANNATTEN

The matter of Vannatten's discharge is more difficult. The ALJ found that during the strike Vannatten and another striker were involved in a rock-throwing incident with a number of strike replacements hired by Garrett. The company discharged Vannatten but did not discipline the other striker or its own employees. The General Counsel argued that Vannatten was singled out because he held a position on the union bargaining committee. The company asserted it was sheer inadvertence that saved the other striker and, as to its own culpable employees, it had no knowledge of their participation in the incident.

The ALJ found that both sides were throwing rocks. The ALJ rejected the General Counsel's anti-union animus theory and found no bad faith or pretext in Vannatten's discharge. Because Vannatten clearly threw rocks and because he had a clear avenue of escape which he did not take, the ALJ concluded that even assuming the replacement employees threw first, rock throwing is not protected activity. The Board, with one member dissenting, rejected the ALJ's recommendation and concluded that the discharge constituted an unfair labor practice. The entire discussion of Vannatten's discharge is contained in a footnote to the Board's opinion. The apparent basis for the Board's reinstatement order was Garrett's failure to fire the employees involved in the rock-throwing incident.

 We agree with the underlying rationale of the Board's conclusion, that is,

if the company knew its employees were equally culpable of misconduct and chose to discipline only the strikers then an unfair labor practice charge would be founded. However, company officials deny that they had knowledge of their own workers' participation in the incident and there is no evidence in the record indicating otherwise. Under these circumstances, we will decline to enforce the Board's order reinstating Vannatten as it is not supported by substantial evidence.

### D. THE BACK-PAY REMEDY

The final issue to be resolved is whether the Board erred in ordering back-pay to the date of Main's unlawful discharge.[8] The company argues that Main, as a striker, was receiving no pay and would receive none while he continued on strike. Consequently, the back-pay remedy should be limited to the date on which the strike was ended and Main would have been available for work. The Board, consistent with its opinion in *Abilities and Goodwill, Inc. and Abilities and Goodwill Association of Professional Employees*, 241 NLRB 27 (1979), *enforcement denied on other grounds*, 612 F.2d 6 (1st Cir. 1979), rejected the company's argument.

*Abilities and Goodwill* changed the longstanding Board rule that a discriminatorily discharged striker had to request reinstatement before the employer's back-pay obligation was triggered. The Board's rationale for changing the rule is set forth in the following passages from *Abilities and Goodwill*:

> The issue is whether an unlawfully discharged striker, unlike an unlawfully discharged employee, must unconditionally request reinstatement in order to trigger an employer's backpay obligation. We

8. The ALJ's precise formulation of the back-pay remedy was that:

> Respondent be ordered to offer Fred Main immediate and full reinstatement to his former position, or if such position no longer exists, to a substantially equivalent position, without prejudice to his seniority or other rights and benefits, and make him whole for any loss of pay or benefits which he may have suffered as a result of Respondent's

> termination of his employment by payment to him of a sum of money equal to that he would have earned as wages and other benefits from his termination to the date of his reinstatement, less his net earnings during that period, and interest thereon.

The Board applied this formula to Senchak and Vannatten as well as to Main. Of course, we have denied enforcement of the Board's order as to Vannatten and Senchak.

believe that the equities and policies of the Act compel a negative answer. It is, of course, well settled that a discriminatorily discharged employee is entitled to reinstatement and backpay from the date of the employer's unlawful action. There is no requirement that such employee first request reinstatement. Indeed, such a request, in all likelihood, would fall upon deaf ears when one considers that the employer has just fired the employee. In this connection, the Board has frequently said that it will not require a person to perform a futile act. Furthermore, since it is the employer who has acted unlawfully in discharging the employee, the burden is on that employer to undo its unfair labor practice by offering immediate reinstatement to the employee, and by reimbursing the employee for all losses suffered from the date of its discriminatory action.

The foregoing rationale is, in our view, equally applicable to employees who are unlawfully discharged while engaged in a lawful strike. A discharged striker is a discharged employee, and is entitled to be treated as such, for there is nothing peculiar to a strike which justifies dissimilar treatment. The nature of the employer's unlawful conduct is not changed by the fact that the employee happens to be a striker at the time of discharge. Furthermore, to require a discharged striker to request reinstatement would be no less futile than it would be for a discharged employee. Thus, no logical reason presents itself for treating the two categories of employees differently. In both cases, the employer has acted in violation of the Act in terminating the employee, and in both cases the burden rightfully rests on the employer to remedy the situation. Accordingly, we now hold that a discharged striker is entitled to backpay from the date of discharge until the date he or she is offered reinstatement. To the extent that this holding represents a departure from prior policy, that policy is hereby overruled.

241 NLRB at 27.

*Abilities and Goodwill* specifically addressed the argument that a back-pay award to the date of discharge may result in a situation where a striker is compensated for a period of voluntarily withheld labor. The Board's answer was as follows:

> The problem in resolving the issue herein is that the discharge of a striker creates an ambiguous situation. When discharged strikers withhold their services after the date of the unlawful discharge, one cannot really be certain whether their continuing refusal to work is voluntary, i.e., a result of the strike, or whether the reason for not making application for reinstatement is that the employer, by discharging the employees, has mistakenly impressed on them the futility of making such an application. Thus, it becomes difficult, if not impossible, to determine whether the employees would have continued to strike and, if so, for how long, had the opportunity to return to work been available. This uncertainty could, of course, be resolved if the employees immediately apply for reinstatement, and, one might say, as our dissenting colleague does, that a showing of such an application is not an unduly burdensome condition for establishing entitlement to backpay. However, because the uncertainty is caused by the employer's unlawful conduct, we will not indulge in the presumption that the discharge itself played no part in keeping the employees out of work. Rather, *it seems to us more equitable to resolve the ambiguity against the wrongdoer and presume, absent indications to the contrary, that the discharged strikers would have made the necessary application were it not for the fact that the discharge itself seemingly made such application a futility.*

*Id.* at 28 (emphasis added).

 The Board's shift of position by placing the burden on the wrongdoer is a type of decision allowable for an agency which has the primary responsibility for formulating remedies designed to minimize the impact of unfair labor practices. As we observed in *NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 163–64 (3d Cir.

1977), our role is to "determine whether the remedy ordered was within the Board's broad discretion, keeping in mind that the order should not be disturbed 'unless it can be shown that [it] is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [National Labor Relations] Act.'" *Quoting Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). Even if on policy grounds, we might have let the "old rule" stand, we will not intrude on the administrative process so deeply that the agency is precluded from formulating or changing standards in an effort to implement its responsibilities under the Act. The basic difference between the old rule and the new is that in the latter the burden is shifted to the wrongdoer. Since the new rule creates only a rebuttable presumption in favor of the discriminatee, we reject Garrett's efforts to shift the burden on to the victim of the unfair labor practice. *Accord NLRB v. Lyon and Ryan Ford, Inc.*, 647 F.2d 745 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *NLRB v. Trident Seafoods Corp.*, 642 F.2d 1148 (9th Cir. 1981). In this case, the company was free to but produced no evidence of Main's unwillingness to return to work after he was unlawfully discharged, nor did it show that he would have refused an offer of reinstatement if it had been tendered. Consequently, we will enforce the Board's order of back-pay to the date of the unfair labor practice discharge.

## IV.

For the foregoing reasons, we will enforce the Board's order to the extent that it is not inconsistent with the proposed order entered by the ALJ. We will grant Garrett's petition for review on the issue of the discharges of Senchak and Vannatten.

JAMES HUNTER, III, Circuit Judge, dissenting:

The pivotal question is whether or not the company and the Union did in fact reach agreement on the terms of a new collective bargaining contract. I respectfully dissent from the majority's position on this point.

I cannot agree that mutual understanding was reached and decline to join the ALJ and the NLRB in their processes of using inferences and "indicators" to construct a bargaining agreement.

We are here reviewing events that took place in a heated and volatile environment,[1] and yet the Board would find a contract despite sharp differences in the recollections of the people who handled the actual negotiations.

These differences are significant. First, the Company maintains there was no discussion of the effective dates for the second and third years of the proposed contract. Despite testimony from Union negotiators Luffey and Boots that support the Company's contention (appendix B–564–65; appendix B–589–90), the ALJ inferred from past contracts between the two parties, and also from the failure of the Company to object to Mannarino's proposal of the anniversary date as the effective date, that April 1, 1979 was in fact agreed upon. However, mere failure to object to a pro-

---

1. Witness the violence which is the subject of the individual discharges.

 *Vannatten*—throwing cobblestones at employees and at a building;
 *Senchak*—threats to kill, endangering employees by weaving in and out between suppliers' truck and company car on a motorcycle;
 *Mann*—assisting in impeding passage by vehicles through company gate.
 Further there is of record a stipulation revealing discharges of:
 (a) *Mijavic and Taylor*—smashing windshields and window with rocks;
 (b) *Miles and Regna*—physical personal assaults with tire iron and baseball bat;
 (c) *Rankin*—throwing rocks through windshield and chasing supply truck and company escort car;
 (d) *Bathhurst*—hitting supplier's truck with nail studded board and placing that board under tires;
 (e) *Hill*—jumping on hood of company car;
 (f) *Trott*—breaking company windows with rocks.
 Appendix B–526–28.

posal does not imply agreement to it. *See E. W. Means and Co. v. NLRB,* 377 F.2d 683 (7th Cir. 1967).

Second, the Company argues that no agreement was reached regarding the extent of the Incentive Bonus Plan. Several issues remain unresolved, including whether an employee has to be employed for a certain period of time or on a particular date in order to receive payment, and whether payment is to be made to all eligible employees or only those who have actually received money under it. The Union contends that agreement was reached on the plan and finds support from the ALJ who states that "the facts do *tend* to support such an *inference*" (emphasis supplied) that the Company is using this issue as "a last minute after thought designed to avoid the bargaining contract." Appendix at 259a. To me, such an "inference" is the shade of a shadow.

Third, the question of whether the work rules should be made part of the contract is in dispute. While the Company maintains that the rules should be part of the contract, the Union and the ALJ contend otherwise. In affirming the ALJ, the NLRB finds that since the parties agreed in substance to the rules this issue is "of little substance." Appendix A–258. I see a sharp remaining difference and am unwilling to accept the ALJ's characterization.

Fourth, there really is no final language. The Company maintains that the ALJ has made a contract out of a few pieces of paper initialed by the parties, and that there are still vital terms on which no meeting of the minds has been reached. Obviously if agreement is not reached on all terms, then there can be no contract. *Pittsburgh DeMoines Steel Co.,* 202 N.L.R.B. 880, 888 (1973). The Union contends that a complete, final agreement has been reached. The ALJ comes to the same conclusion as the Union; however, his decision is once again based on inferences and conjecture. He speculates "that the Union

would not talk about calling off a strike for less than a complete bargain; also, that the parties [2] would not consider it necessary to call counsel at home on Sunday evening to report acceptance of some part of, but not all of, an agreement; moreover, that the parties did not contemplate another negotiating session of the kind to which they were accustomed." Appendix at 256a.

To me, this symbolizes the vice of the ALJ's approach. There could well be reasons why a strike would be abated even without a complete bargain. There could be a need for cooling off, for more study of one or more areas or even to allow time to check back to get a gauge on the chances of ratification. The ALJ accords weight to a Sunday evening call to counsel. In any negotiating context, quiet or tense, it is, to me, naive to attach any significance to an evening call—even on Sunday.

Finally, other unresolved issues include the status of the repairman classification, whether employees should be required to work outside in extreme temperatures, and the nature of an employee stock ownership plan. The Company maintains that these proposals are unresolved, while the Union contends they are withdrawn from the putative contract. The ALJ, in finding for the Union, infers from the failure to discuss these issues that they were withdrawn by the Union. The rationale used by the ALJ is that the Union negotiators' declaration that a ratification vote would be taken was, in fact, a withdrawal of these proposals. However, on more than one prior occasion the Union had taken the Company's offers to the membership for ratification even though unresolved issues remained. Appendix B–103–104.

While it is, of course, possible that some of the arguments raised by the NLRB in support of oral contracts might have validity in a placid and routine renegotiation context, my position goes further than the majority which is "reluctant to endorse" oral bargaining agreements (maj. op. p. 736).

---

**2.** In fact it was the Union negotiator Mannarino who suggested the procedure (appendix B– 69, 91, 343).

744

I am totally unwilling to find an agreement where the atmosphere is highly charged and where sharp differences emerge and remain. It is for the parties to reach an agreement, not for the ALJ and the NLRB to construct it for them by "indicators" and speculative hindsight. In *NLRB v. N.Y. —Keansburg-Long Branch Bus*, 578 F.2d 472, 477 (3d Cir. 1978) we said:

> This teaching [that in the field of labor relations parties may sometimes be held to oral contract terms] is necessarily subject however to the *overriding precondition* that the parties in the first instance must have agreed to the terms of the contract which is sought to be enforced. *H. K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 102, 90 S.Ct. 821, 822, 25 L.Ed.2d 146 (1970) (emphasis added). It is only a written contract embodying *agreed* terms which the Board may require the company to sign. *H. J. Heinz Co. v. NLRB, supra*, 311 U.S. at 526, 61 S.Ct. 320 (emphasis in original).

> It therefore becomes apparent that the first inquiry to be made is whether, in fact, the parties did agree on the terms and the conditions of the contract.... [I]f the substantive terms had not been agreed to by the employer, then of course we may not compel, as the Board may not, the execution of any document.

Our holding in *Keansburg* controls the case before us.[3]

If the record proves anything; it proves that there was confusion, and that sharp differences in important areas exist. This is the natural result of intensity and emergency.

I cannot find support for a finding of complete agreement here and do not feel that it is proper for the missing pieces to be filled by administrative inference.

Accordingly, I respectfully dissent.

**3.** The factual and procedural posture of *Keansburg* was very similar to the case at bar. In that case we denied enforcement of an NLRB order forcing the Company to execute a collective bargaining contract after it had allegedly reached agreement with the Union. Our denial was based on the fact that the record contained evidence indicating that the parties never reached a final agreement on two issues: a minimum work force provision and a provision providing for waiver of part-time driver representation. 578 F.2d at 478, 480. It is beyond cavil that the issues on which the parties in the case before us did not reach agreement are at least as significant, if not more so, than those in *Keansburg*.