4 F.3d 982
 144 L.R.R.M. (BNA) 2616
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
LOCAL 14 UNITED PAPERWORKERS INTERNATIONAL UNION, AFL-CIO
and International Brotherhood of Firemen and
Oilers, Local 246, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD Petitioner,
v.
INTERNATIONAL PAPER COMPANY, Respondent.
 Nos. 92-2236, 92-2346.
 United States Court of Appeals,
First Circuit.
 Aug. 19, 1993.
 
 On Petition for Review of an order of the National Labor Relations Board
 Jeffrey Neil Young with whom McTeague, Higbee, Libner, MacAdam, Case & Watson was on brief for Local 14 United Paperworkers International Union, etc.
 Vincent J. Falvo, with whom Linda Dreeben, Supervisory Attorney, Julie B. Broido, Senior Attorney, Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy General Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief for National Labor Relations Board. Jane B. Jacobs with whom Nancy B. Schess, Lee R. A. Seham, and Seham, Klein & Zelman were on brief for International Paper Company, amicus curiae.
 N.L.R.B.
 AFFIRMED.
 Before Boudin, Circuit Judge, Coffin, Senior Circuit Judge, and Stahl, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 Local 14, United Paperworkers International Union, AFL-CIO and International Brotherhood of Fireman and Oilers, Local 246, AFL-CIO (referred to collectively as "the Union") petition this court to review and set aside that portion of an order of the National Labor Relations Board ("the Board") affirming International Paper Company's ("IP") discharge of four striking employees for strike-related misconduct. IP intervenes on the side of the Board. The Board cross-petitions for enforcement of that part of its order requiring IP to offer a fifth striker reinstatement. In the Board's cross-petition, the Union intervenes on the side of the Board. For the reasons set forth below, we grant enforcement of the Board's order in its entirety.
 
 I.
 FACTUAL BACKGROUND
 
 2
 IP operates the Androscoggin Paper Mill in Jay, Maine. Approximately 1200 members of the Union are among the employees at the Jay facility. In June 1987, the collective bargaining agreement between IP and the Union expired, and Union workers went on strike. Nevertheless, IP maintained operations at the mill throughout the strike, employing non-striking union members and non-union replacement workers. The walkout was marked by periodic outbreaks of violence, threats, and general strike-related misconduct. In October, 1988, after the strike ended, IP discharged eleven strikers.
 
 
 3
 The discharges prompted the Union to file an unfair labor practice charge alleging that IP violated sections 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(3) and (1) ("the Act"). The Union maintained that IP discriminated against striking employees by dismissing strikers for strike-related misconduct while failing to dismiss non-strikers who had engaged in equally serious or more serious misconduct. In a hearing before an Administrative Law Judge ("ALJ"), the Union's discrimination challenge was limited to the discharge of the following five strikers: Lawrence Bilodeau, Lawrence Chicoine, Forrest Flagg, Thomas Hamlin, and Arthur Storer. The ALJ compared their respective acts of misconduct with that of non-striker Andrew Barclay and found that all five strikers had engaged in strike-related misconduct which warranted their discharge, but that IP's dismissal of strikers Bilodeau and Flagg constituted unlawful disparate treatment. The ALJ's finding was predicated on his determination that non-striker Barclay, who retained his job but received a warning, had engaged in strike-related misconduct at least as serious as the misconduct of Bilodeau and Flagg. The ALJ found no disparate treatment, however, in IP's discharge of Chicoine, Hamlin and Storer. Both IP and the Union filed exceptions to the ALJ's decision.
 
 
 4
 On September 20, 1992, the Board issued a final decision and order. The Board affirmed the ALJ's finding that IP had not engaged in disparate treatment in dismissing Chicoine, Hamlin and Storer. The Board also sustained the ALJ's holding that IP had wrongfully discharged Bilodeau and ordered his reinstatement. However, the Board reversed the ALJ's decision as to Flagg, finding his misconduct more serious than that committed by any of the non-strikers. This petition for review and cross-petition for enforcement followed.
 
 II.
 Standard of Review
 
 5
 This court must enforce the Board's order if its findings are supported by substantial evidence on the record considered as a whole and if it correctly applied the law. NLRB v. Acme Tile & Terrazzo Co., 984 F.2d 555, 556 (1st Cir. 1993). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." NLRB v. Auciello Iron Works, Inc., 980 F.2d 804, 807 (1st Cir. 1992) (citations and internal quotations omitted). We are compelled to review the Board's order with considerable deference and "may not substitute [our] own judgment for that of the Board when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Destileria Serrales, Inc. v. NLRB, 882 F.2d 19, 21 (1st Cir. 1989) (citations and internal quotations omitted). Moreover, when this court reviews an agency's credibility finding, "we must accept the finding unless it exceeds 'the bounds of reason.' " Boston Mut. Life Ins. Co. v. NLRB, 692 F.2d 169, 170 (1st Cir. 1982) (quoting P.S.C. Resources, Inc. v. NLRB, 576 F.2d 380, 382 (1st Cir. 1978)). Finally, "we need not limit ourselves to the exact grounds for decision utilized below. We are free, on appeal, to affirm a judgment on any independently sufficient ground." Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 6 (1st Cir. 1992) (quoting Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir. 1987)), cert. denied, 113 S. Ct. 1416 (1993).
 
 III.
 
 6
 Conduct of Five Strikers and Non-Striker Barclay
 
 
 7
 Having carefully reviewed the ALJ's factual findings, which were adopted by the Board, we find them eminently supportable and therefore accept the ALJ's version of the events. We summarize them as follows:
 
 
 8
 Non-striker Andrew Barclay: On July 30, 1987, Barclay and his son, carrying baseball bats, confronted a group of strikers who were attending a party near Barclay's lakefront home. Barclay complained to the strikers about being harassed and constantly called a "scab", and told them that he and his son were there to "clean [the strikers] all out."[1] The strikers asked Barclay to leave, but he did not. In an attempt to wrest the bat from Barclay, striker Charles Fullerton received a cut that required minor medical attention.
 
 
 9
 Striker Lawrence Bilodeau: On October 28, 1987, Bilodeau, returning home from work, passed the home of a replacement worker. At the time, the worker was standing in front of his house with his family. Bilodeau then turned his truck around and stopped in front of the worker's home. Bilodeau noticed that the worker was writing down his license plate number, and yelled "I've worked at the mill for twenty years, and you ain't gonna be living here long you [expletive deleted]. Go ahead and write down my license. I live right around the corner."
 
 
 10
 Striker Lawrence Chicoine: On June 27, 1987, Chicoine was picketing outside of the mill when he accosted one non-striker and told her that he would kill her for crossing the picket line. On July 1, 1987, Chicoine was again picketing outside of the mill when he used a megaphone to threaten a number of replacement workers as they arrived for work that "he had a .44" and "would blow [their] heads off."
 
 
 11
 Striker Forrest Flagg: On December 8, 1987, a replacement worker drove by Flagg as Flagg picketed outside of the mill. Flagg opened the passenger door of the replacement worker's car, reached into the car, and shouted "I'll kill you."
 
 
 12
 Striker Thomas Hamlin: On August 7, 1987, after consuming a large quantity of beer and smoking numerous marijuana cigarettes, Hamlin got into a truck and followed two groups of replacement workers as they returned home from work. Hamlin harassed them and attempted to run them off the road with his truck.
 
 
 13
 Striker Arthur Storer: On August 6, 1987, as a replacement worker exited the mill, Storer threw a rock at her car, kicked the car, and then jumped on the car's bumper.
 
 IV.
 Discussion
 A. Disparate Treatment
 
 14
 The Union's principal contention is that IP engaged in unlawful disparate treatment by discharging the five strikers listed above for engaging in strike-related misconduct which was less serious than misconduct committed by non-striker Barclay, who was merely warned.[2] The Board agreed with the Union as to Bilodeau, but not as to the other four strikers. We agree with the Board's conclusions.
 
 
 15
 Pursuant to Sec. 7 of the Act, "employees are granted the right to peacefully strike, picket and engage in other concerted activities for the purpose of collective bargaining." NLRB v. Preterm, Inc., 784 F.2d 426, 429 (1st Cir. 1986). Section 7 also allows employees the right to refrain from these activities if they so desire. Id.
 
 
 16
 "At the end of an economic strike, an employer, unless otherwise justified, must reinstate striking employees, lest their discharge penalize the employees for exercising their right to strike under Sec. 7 of the Act." Associated Grocers of New England, Inc. v. NLRB, 562 F.2d 1333, 1335 (1st Cir. 1977). It is well established that an employer is justified in discharging a striking employee who engages in serious strike-related misconduct. Preterm, 784 F.2d at 429; Associated Grocers, 562 F.2d at 1335. Behavior that "reasonably tend[s] to coerce or intimidate non-striking employees in the exercise of their right to refrain from strike activities" constitutes serious strike-related misconduct and is cause for discharge as a matter of law. Preterm, 784 F.2d at 429 (quoting Clear Pine Mouldings, 268 N.L.R.B. 1044, 1047 (1984), enforced mem., 765 F.2d 148 (9th Cir. 1985)). See also General Indus. Employees Union, Local 42 v. NLRB, 951 F.2d 1308, 1314 (D.C. Cir. 1991) (similar); Newport News Shipbuilding & Dry Dock Co. v. NLRB, 738 F.2d 1404, 1408 (4th Cir. 1984) (similar); Associated Grocers, 562 F.2d at 1336 (stressing the objective nature of the test).
 
 
 17
 Importantly, however, an employer may not knowingly tolerate misconduct by non-strikers that is at least as serious as, or more serious than, the misconduct of strikers whom the employer has discharged. See Garrett R.R. Car & Equip. v. NLRB, 683 F.2d 731, 740 (3rd Cir. 1982) (holding that an employer committed an unfair labor practice where it knew non-striking employees were equally culpable of misconduct but chose to discipline only strikers). In determining whether an employer has discriminated against striking employees, a one-on-one comparison between the acts of misconduct committed by the strikers and those committed by non-strikers is appropriate. See generally id. (comparing behavior of strikers with that of employees who were not discharged).[3]
 
 
 18
 1. Strikers Chicoine, Flagg, Hamlin and Storer
 
 
 19
 The Board determined that, because the misconduct of strikers Chicoine, Hamlin, Flagg and Storer was more serious than the misconduct of non-striker Barclay, IP's decision to discharge the four strikers did not constitute disparate treatment. Essentially, the Board found that Barclay's behavior was provoked, and hence less serious than the strikers' misconduct, which, in each instance, was instigated by the striker.
 
 
 20
 We think that substantial evidence exists in the record to support the Board's finding that Barclay was provoked. Before confronting the strikers, Barclay had been harassed at his home by a group of strikers. As we have observed, there was evidence suggesting that strikers had blown air horns from their boats in front of his house, shouted obscenities, threatened him, and fired a projectile through his window, showering his son with glass. It was only after these violent threats and acts that Barclay confronted a group of strikers with a baseball bat and angrily threatened them.
 
 
 21
 In contrast, the record is devoid of evidence suggesting that the actions of strikers Chicoine, Flagg, Hamlin and Storer had been provoked in any way. Although we do not condone Barclay's conduct, we think the Board's conclusion that his provoked behavior was less egregious than the unprovoked actions of the four strikers was a reasonable one under the circumstances. Accordingly, we uphold the Board's decision rejecting the disparate treatment claims of Chicoine, Flagg, Hamlin, and Storer.
 
 2. Striker Bilodeau
 
 22
 The Board also adopted the ALJ's conclusion that the misconduct of Barclay was more flagrant than that of Bilodeau, and that IP therefore acted unlawfully by discharging Bilodeau but merely issuing a warning to Barclay. The ALJ's conclusion was based on his finding that (a) Barclay's threat was one of physical injury and was therefore more serious than Bilodeau's threat to property, and (b) Bilodeau's threat was "less than explicit."
 
 
 23
 The major difference between the conduct of Bilodeau and Barclay, in our view, is that Barclay made his threat with a baseball bat in hand, and thus possessed an immediate ability to act on the threat. Bilodeau, on the other hand, made his threat while standing in the road in front of the replacement worker's house, with no apparent ability or intent to immediately carry out his threat. Record evidence, therefore, supports the ALJ's conclusion that Barclay's behavior was more egregious than that of Bilodeau. See Associated Grocers, 562 F.2d at 1336 (explaining that courts should evaluate threats in light of all the surrounding circumstances).
 
 B. Miscellaneous
 
 24
 The Union raises two subsidiary arguments, each of which we find unpersuasive. First, the Union argues that, because IP failed to obtain the strikers' first-hand accounts of the incidents, it could not, as a matter of law, have fashioned an honest belief that the strikers committed the misconduct for which they were discharged. As the record reveals, however, a number of eye-witnesses were present at each of the incidents. In fact, two of the episodes were captured on videotape. Further, evidence in the record supports a finding that IP relied on these eye-witness accounts and the videotape. Thus, although IP's understanding of the events would undoubtedly have been fortified by interviews with each striker, we cannot say that the failure to conduct striker interviews, given this direct evidence, rendered their decision to discharge those strikers unlawful.
 
 
 25
 The Union also argues that IP condoned the strikers' conduct when it sent each striker a form letter on February 1, March 24, and September 23, 1988, outlining the reinstatement rights of striking employees. Condonation exists only when clear and convincing evidence is present showing an employer's desire "to forgive" the guilty employee for the misconduct. See Jones & McKnight, Inc. v. NLRB, 445 F.2d 97, 103 (7th Cir. 1971). See also Woodlawn Hosp. v. NLRB, 596 F.2d 1330, 1341 (7th Cir. 1979) (holding that condonation exists only "where the employer has clearly indicated forgiveness"). We agree with the ALJ's conclusion, adopted by the Board, that a form letter sent to approximately 1250 workers, informing the striking employees of their statutory right to reinstatement under certain circumstances, falls well short of clear and convincing evidence that IP condoned the misconduct of the five strikers.[4] Accordingly, the Union's condonation argument is unavailing.[5]
 
 V.
 Conclusion
 
 26
 Because we find that the Board correctly applied the law and that substantial evidence in the record supports all of the Board's findings, we grant enforcement of the Board's order in its entirety.
 
 
 27
 Affirmed. No costs.
 
 
 
 [1]
 Barclay later told an IP employee who investigated the incident that prior to this incident, a number of boats full of strikers had pulled up in front of his home, and had blown air horns, cursed, and threatened him and his family. Barclay also claimed that the boats fired a projectile which broke a window in his home, spraying glass over his son
 
 
 [2]
 To prove disparate treatment, a discharged striker need only show that his/her misconduct was less serious than that of one non-striker who was not discharged. Here, the ALJ deemed the conduct of Barclay to be the most serious of the non-strikers who retained their jobs. Having carefully reviewed the record, we agree with the ALJ's conclusion on this question. Accordingly, we use Barclay's conduct as the benchmark against which to measure the Union's disparate treatment claims
 
 
 [3]
 IP insists that because Barclay's misconduct was not similar to any of the acts committed by the five strikers, it is not appropriate for disparate treatment purposes to compare their behavior with his. However, only the rarest of disparate treatment cases would involve identical allegations of misconduct. Adoption of IP's position would, therefore, effectively foreclose disparate treatment analysis in the vast majority of these kinds of cases. Because we find such a requirement to be unduly stringent, we reject IP's argument
 
 
 [4]
 Because we agree with the Board's conclusion that IP's decision to discharge strikers Chicoine, Flagg, Hamlin and Storer was not discriminatory, we need not reach IP's alternative argument that the Union's claims as to those strikers are time-barred under section 10(b) of the Act, 29 U.S.C. Sec. 160(b)
 
 
 [5]
 We have reviewed the remainder of IP's and the Union's arguments and find them to be without merit