**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SEQUOYAH MILLS, INC., Respondent.**

**No. 10141.**

United States Court of Appeals Tenth Circuit.

April 15, 1969.

---

Roger Sabo, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., N. L. R. B., on the brief), for petitioner.

Edward E. Soulé, Oklahoma City, Okl. (Jack G. Bush, Anadarko, Okl., with him on the brief), for respondent.

Before MURRAH, Chief Judge, SETH, Circuit Judge, and CHRISTENSEN, District Judge.

SETH, Circuit Judge.

The National Labor Relations Board petitions this court to enforce its order that respondent employer violated section 8(a) (1) of the Act by discharging employees Carl Pyle, Raymond Steen, Hosey Kane, and Walter Taylor for engaging in protected concerted activity, and that these employees be reinstated with back pay, and for other relief usual in such circumstances.

The sole question to be determined is whether the record as a whole discloses substantial evidence to support the Board's finding.

Respondent is a manufacturer of carpets, and employs nineteen over-the-road truck drivers to haul its goods. On Sunday, December 4, 1966, twelve of the drivers met to discuss the terms of their employment, and the four employees named above were selected to discuss their grievances with the respondent's executive vice president Lee. The following day, employees Pyle, Steen, and Kane (Taylor was away on a trip) spoke with Montgomery, the assistant director of personnel, about the dispatcher's reducing the hours scheduled to make a trip, and about the fact that when the drivers reported for their trucks often the warehousemen had not yet loaded them. Montgomery stated that the scheduled time for trips which the men were accustomed to had been reinstated, and that the shorter time had been put into effect by a dispatcher who was no longer with the company. Regarding the delay in the truck loading, Montgomery said he would see what he could do about it. The employees still apparently wanted to meet with the respondent's executive vice president Lee, and Montgomery stated that he would see what he could do about arranging a meeting with him. This meeting was never held, and shortly thereafter these employees left on over-the-road trips for the company.

Employee Carl Pyle returned from an over-the-road trip on a Sunday evening, December 11, and on the following morning when he reported for work, Montgomery told him that he had the choice of either resigning or being laid off. He asked for an explanation and was told that he was "unhappy" with his job. No other explanation was given to Pyle who had been employed for about two years.

When employee Raymond Steen returned Friday, December 9, Montgomery and the vice president in charge of industrial relations, Carver, informed him that he was being discharged because apparently he was "dissatisfied" with his job and he had been "running the company's name down." He requested to see the reports allegedly received about him, but his request was refused.

Hosey Kane returned from his over-the-road trip on a Saturday, December 10, and was informed by Taylor, who had been discharged on Friday, that he too would probably be fired. Kane did not report for work on Monday in order to avoid the probable news that he had been fired. That night he listened in to a telephone conversation that his fellow employee Pyle made to vice president Carver wherein Pyle stated he understood the discharged drivers would be reinstated if they "did not group up any more." During this conversation Kane heard his name mentioned and that he too would be discharged, and that the decision regarding all the drivers' discharges was final. The following morning Kane went to the respondent's office where he was discharged. He asked for no explanation, being aware of the reason which was as stated by Carver during the conversation the previous night that there existed a "company policy that there will be no grouping of employees."

Walter Taylor, although a member of the group of four employees selected to present the drivers' grievances to the respondent, was unable to attend the Monday, December 5th meeting with Montgomery because he was away on an over-the-road trip. When he returned on December 8, Montgomery asked him why he had not arrived at his destination in Houston on Tuesday, since the company there had lodged a complaint late Tuesday night with the executive vice president that the respondent's goods expected that afternoon had not arrived. Taylor replied he thought he was to arrive on Wednesday morning. On Friday he was discharged for having arrived late at his scheduled destination.

■ It is well settled that even though union activities are not specifically involved, the presentment of grievances by a group of employees to their employer constitutes a concerted activity which section 7 of the Act was designed to protect. National Labor Relations Board v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298

(1962); Hagopian & Sons, Inc. v. NLRB, 395 F.2d 947 (6th Cir. 1968); Metal Blast, Inc. v. NLRB, 324 F.2d 602 (6th Cir. 1963); and see generally Cain's Coffee Co. v. NLRB, 404 F.2d 1172 (10th Cir. 1968); NLRB v. City Yellow Cab Co., 344 F.2d 575 (10th Cir. 1965); Western Contracting Corp. v. NLRB, 322 F.2d 893 (10th Cir. 1963).

■ A court where enforcement of a Board's order is sought starts with the position that the findings of fact and the drawing of inferences are for the Board. NLRB v. Western Meat Packers, Inc., 368 F.2d 65 (10th Cir. 1966); Santangelo & Co. v. NLRB, 364 F.2d 979 (10th Cir. 1966); NLRB v. Central Oklahoma Milk Producers Ass'n, 285 F.2d 495 (10th Cir. 1960).

It is respondent's position here that the employees were discharged for cause and not in violation of the Act, inasmuch as the executive vice president and the chairman of the board of the respondent had been hearing complaints from its customers concerning the actions of the company drivers. Further it is respondent's position that it was merely coincidental that the discharges occurred approximately a week after some of the drivers had grouped together to air their grievances, and that there was no evidence that the executive vice president who was the person responsible for discharging the employees had any knowledge of the drivers' meetings. Respondent urges also that the Board could just as reasonably have inferred that the discharged employees knew that a checkup was likely and imminent because of the many complaints from customers, and that the December 5th interview was conceived in an effort to insulate themselves from their anticipated discharges.

■ As we pointed out above, it is the province of the Board to find facts and draw inferences and, in this case, the Board chose to infer that the reason the employees were discharged was because they engaged in a concerted activity protected by section 7 of the Act. Moreover it should be mentioned that the Board in drawing its inferences could weigh the timing of the discharges, Cain's Coffee Co. v. NLRB, 404 F.2d 1172 (10th Cir. 1968), NLRB v. Richard W. Kaase Co., 346 F.2d 24 at 29 (6th Cir. 1965), and consider the percentage of employees involved in the protected activity who were discharged, NLRB v. Camco, Inc., 340 F.2d 803 at 809 (5th Cir. 1965). See also Betts Baking Co. v. NLRB, 380 F.2d 199 (10th Cir. 1967), and NLRB v. Sifers, 171 F.2d 63 (10th Cir. 1948). It is significant that the discharges here took place approximately one week after the drivers met and upon the men's return from their over-the-road trips. Of the five employees at that time discharged four had been chosen at the Sunday meeting to present the drivers' grievances to management and three, Pyle, Steen, and Kane, actually met with the assistant personnel director and told him there had been a meeting and that the drivers did have grievances. As to the respondent's position that there was no evidence that management was aware of the drivers' meetings, Montgomery testified that the drivers informed him they had had a meeting and although he denies having actually told the executive vice president that the particular meeting had taken place due to the fact he thought the grievances were routine, the record does indicate that Montgomery did enjoy a close relationship with the other officers of the company, specifically Lee, and the Board could reasonably draw the inference that management shared Montgomery's knowledge. Northern Virginia Steel Corp. v. NLRB, 300 F.2d 168 (4th Cir. 1962); Furr's, Inc. v. NLRB, 381 F.2d 562 (10th Cir. 1967).

■ Finally, we share the opinion of the trial examiner that "the case of Walter Taylor presents a more difficult problem." Taylor, although selected to be one of the committee of four to present the drivers' grievances, because he had to be away on a trip did not accompany Pyle, Steen, and Kane to the December 5th meeting with Montgomery. The record is completely devoid of evidence that Montgomery or any other official of the respondent was aware that Taylor had

been selected by the drivers to be a member of the committee. Further, Taylor by his own testimony admits to having falsified his schedule. Also, respondent's statement that a complaint had been received regarding Taylor's delayed delivery the week prior was not refuted. In light of the above, we cannot hold that the Board's inference that Taylor was discharged because he engaged in protected, concerted activity was based on substantial evidence, and therefore the Board's order as to him shall not be enforced. Cain's Coffee Co. v. NLRB.

The Board's order as to Pyle, Steen, and Kane will be enforced because examination of the record as a whole indicates that the Board's inference that their discharges were in violation of section 7 of the Act is based upon substantial evidence. The order as it pertains to Walter Taylor will not be enforced.