**FRITO–LAY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 77–2350.

United States Court of Appeals,
Third Circuit.

Argued Aug. 7, 1978.

Decided Sept. 26, 1978.

Duane C. Aldrich, Atlanta, Ga., Richard
R. Boisseau, R. Slaton Tuggle, III, Kilpat-
rick, Cody, Rogers, McClatchey & Regen-
stein, Atlanta, Ga., Jacob P. Hart, Schnad-
er, Harrison, Segal & Lewis, Philadelphia,
Pa., for petitioner.

Janet C. McCaa, Joseph P. Norelli, John
S. Irving, John E. Higgins, Jr., Carl L.
Taylor, Elliott Moore, N.L.R.B., Wash-
ington, D. C., for respondent.

Before ALDISERT, VAN DUSEN and
HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Frito-Lay, Inc. petitions for review, and
the National Labor Relations Board (Board)
cross petitions for enforcement, of the
Board's decision holding that Frito-Lay
committed unfair labor practices arising out
of a union representation election. The
Board found that Frito-Lay violated sec-

tions 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5) (1976).[1] Since this court finds substantial evidence in the record as a whole to support the sections 8(a)(1) and (5) violations, the cease and desist and bargaining orders will be enforced. However, the section 8(a)(3) violation is not supported by substantial evidence and this court will not enforce the Board's order requiring the reopening of one of Frito-Lay's plants and the reinstatement and award of back pay to the discharged employees.

## FACTS

The dispute involves a manufacturing plant located near Sharon, Pennsylvania, where Frito-Lay produced potato pellets, an intermediate product from which Munchos Brand Potato Crisps are made. Frito-Lay is a corporation employing some 15,000 employees with 37 manufacturing plants of which 18 are union organized.

In June, 1974 Frito-Lay began a process of hiring production and maintenance employees for the Sharon facility. Since the plant was to use an "Open Management" system of employee organization,[2] the job applicants were screened for their ability to adapt to this structure. After the Sharon plant had been prepared for opening but before the commencement of production, Frito-Lay noted a decrease in demand for the Munchos product. Nevertheless, it decided to open the Sharon facility in September, 1974.

Demand for Munchos continued to decrease. In December, 1974 Frito-Lay began studies concerning the shutdown of the Sharon plant. In January, 1975 a study by engineering personnel and management officials recommended that Sharon be closed. However, no final decision was made at that time.

The union organizing campaign began during the first week of February, 1975. By February 6, 1975 the Union had obtained authorization cards from 21 of the 41 employees. The next day, Union Representative Frank Scalish advised the Sharon plant manager of the Union's majority status and requested recognition. The request was refused. On February 18, 1975 Frito-Lay Vice President for Labor Relations, Leonard Clegg, indicated his desire to resolve the issue by a representation election. By February 20, 1975 the Union had obtained authorization cards from seven additional employees raising its total to twenty-eight. In late February, 1975 the company agreed to a consent election which was later scheduled for March 18 and 19, 1975.

During February and March, 1975 the company conducted a series of meetings and discussions with employees out of which many of the alleged section 8(a)(1) violations arose. Also in late February, 1975, Frito-Lay announced a twenty-five cents per hour across the board raise in pay which first appeared in the employees' paychecks on March 14, 1975.

The Union lost the representation election by a vote of 22 to 17. Shortly thereafter, the Union filed objections to the election and unfair labor practice charges against Frito-Lay. In April, 1975 Frito-Lay decided to close the Sharon plant. The decision was announced to the employees on May 14, 1975 and production ceased in early June, 1975. The company continued to manufac-

---

**1.** Sections 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5) (1976), provide:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discour-

age membership in any labor organization:
. . . .;

. . . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

**2.** The Open Management concept involves a "team" approach in which the employees give input into management decisions affecting their work schedules, vacation time, and other matters directly affecting their working conditions.

ture the potato pellets at a plant (Brookhollow II) in Dallas, Texas where they had also been manufactured before and during the operation of the Sharon facility.

The Administrative Law Judge (ALJ) found that Frito-Lay had committed acts which violate sections 8(a)(1), (3), and (5) of the Act. He issued an order to Frito-Lay to cease and desist from certain unlawful practices, to pay limited back pay to former employees of the plant, to establish a preferential hiring list for former Sharon employees at other Frito-Lay facilities, and if Frito-Lay reopened the Sharon facility, to reinstate the former employees and to bargain with the Union.

The Board, in addition to the violations found by the ALJ, ruled that the decision to close the plant was itself a section 8(a)(3) violation. It ordered that the plant be reopened, that back pay be awarded to former employees for the entire time that the plant had been closed, and that Frito-Lay bargain with the Union immediately. Frito-Lay petitions for review of the order.

## SECTION 8(a)(1) VIOLATIONS

The Board accepted the findings of the Administrative Law Judge that Frito-Lay violated section 8(a)(1) of the Act. Specifically, it found that petitioner engaged in unlawful interrogations, threats of discharge or other types of reprisal, creation of the impression of surveillance, implementation of a wage increase, and threats to close the plant.

■ The ALJ pointed to several specific instances of unlawful interrogations. For example, on February 4, 1975 employee Collenette was approached by team leaders Riley and Kettlehut and, according to his testimony, was questioned about his knowledge of the Union. When he replied that he was aware of the Union's efforts, he was told that he "had better take a look at the benefits that [he] had under the [Open Management] System and think it over twice." During February, 1975 employee Fall was twice interrogated about the Union at his work station by team leader Riley. At the second meeting, Riley related a

story about a plant in Texas which the employer stated he would shut down if the plant became union organized. In March, Riley conducted a meeting of his production team where he, according to the testimony of employee Sandor, asked the employees why they wanted a union and stated that he felt unions were unnecessary. This court has held that it is a violation of section 8(a)(1) to interrogate employees about their union sympathies when doing so suggests to the employees that the employer may take action against them because of their pro-Union sympathies. *NLRB v. Clapper's Manufacturing, Inc.,* 458 F.2d 414, 417–18 (3d Cir. 1972). The test is whether the questioning tends to be coercive, not whether the employee is actually coerced. *NLRB v. Camco, Inc.,* 340 F.2d 803, 804–05 n.6 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965); *International Union of Operating Engineers v. NLRB,* 328 F.2d 850, 852–53 (3d Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964).

■ The Board's findings of threats of discharge or other types of reprisal are also adequately supported in the record. Employee Collenette testified that team leaders Riley and Kettlehut showed him newspaper articles about strikes and warned that if the Union and Frito-Lay could not reach agreement "there would be a long strike" which would result in "some peoples' children starving." Employee Hunter, a principal force in the union organizing campaign whose testimony was specifically credited by the ALJ, stated that on February 12, 1975, he was called into the office of Plant Manager McInvale. Though Hunter at that time denied passing out union cards, McInvale said that if Hunter was going to start trouble, there would be trouble for him. In early March, according to Hunter, McInvale told him that he would have Hunter's job if he heard any more rumors about Hunter starting a union. Later, team leader Kettlehut told Hunter to "shut your mouth about trying to get a union down here because they're out to get you." Threats of discharge are coercive and con-

stitute violations of section 8(a)(1). *NLRB v. Triangle Publications, Inc.,* 500 F.2d 597 (3d Cir. 1974); *NLRB v. Erie Marine, Inc.,* 465 F.2d 104, 106 (3d Cir. 1972).

Plant Manager McInvale was found by the ALJ to have created the impression of surveillance by telling Hunter that he "understood" from "an individual" and that he had "heard . . . rumors" that Hunter was starting a union. Creating the impression of surveillance of employees' efforts to form a union has been held to violate section 8(a)(1). *Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1144 (3d Cir. 1977); *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 242 (3d Cir. 1976).

The ALJ also found that Frito-Lay violated section 8(a)(1) by implementing a wage increase to influence employee votes in the representation election. Under the doctrine of *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), conferring benefits on employees to influence their votes is a violation of the Act. *Accord, Carlisle Paper Box Co. v. NLRB,* 398 F.2d 1, 4 (3d Cir. 1968). The record shows that the wage increase was announced on February 21, 1975 and was reflected in the paychecks of the employees on March 14, 1975, four days before the election. While the company argues that the wage increase was contemplated as early as June, 1974 (even prior to the opening of the plant) and that a wage survey was completed in January, 1975, the record supports the finding by the Board that the timing of the wage increase was manipulated to influence the election. The proof of the intent to manipulate is buttressed by the letter distributed with the pay increase which reminded employees that "Frito-Lay pays the wages, gives the holidays, vacations, group insurance, & pension benefits and while a union can beg for changes, Frito-Lay decides if they will be changed."

Finally, the ALJ found that Frito-Lay made repeated threats to close the plant if the employees voted for union representation. In late February or early March, 1975, according to employee Sandor, team leader Riley told a meeting of his team that "if the union came in, Frito-Lay would have to reevaluate the plant solely on economic grounds" and that "the chances were that there would be layoffs, or some sort of slowdown, or possibly even a shutdown at Sharon, because they could produce it cheaper in Dallas." The record shows that the Vice President of Frito-Lay for Labor Relations, Leonard Clegg, made similar statements at team meetings he conducted in early March, 1975 and at a mandatory employees' meeting on March 17, 1975, the day before the election. It is well established that threats by an employer to close a plant if the employees vote for union representation violate section 8(a)(1) of the Act. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *NLRB v. Eagle Material Handling, Inc.,* 558 F.2d 160, 165 (3d Cir. 1977).

Frito-Lay contends that its statements are protected by the first amendment and section 8(c) [3] of the Act. In balancing the requirements of sections 8(a)(1) and 8(c), the Supreme Court in *Gissel* held that the employer may predict the consequences of unionization if the prediction is "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control." 395 U.S. at 618, 89 S.Ct. at 1942. We cannot agree that Frito-Lay comes within this holding. Unionization alone would not create a situation generating probable consequences beyond Frito-Lay's control, forcing it to close the Sharon plant. Notwithstanding unionization, Frito-Lay would still retain the choice whether to close the plant or continue to operate it based on its ability to market profitably the product produced there, and not necessarily based on the mere existence of a union.

---

3. Section 8(c) of the Act, 29 U.S.C. § 158(c) (1976), provides:

(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

■ We find, then, that the Board's findings of section 8(a)(1) violations are supported by substantial evidence considering the record as a whole.

## SECTION 8(a)(3) VIOLATIONS

The Board found that the decision to close the Sharon facility constituted a violation of section 8(a)(3) of the Act. In so doing, it reversed the finding by the ALJ that the decision to close was economically justified and was "reasonably firm" prior to the beginning of the union organization campaign.

The analysis of whether a plant closing is a violation of section 8(a)(3) is governed by *Textile Workers of America v. Darlington Manufacturing Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). The Supreme Court held that a "partial" closing is an "unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect." *Id.* at 275, 85 S.Ct. at 1002. Further, the Court noted:

> It does not suffice to establish the unfair labor practice charged here to argue that the Darlington closing necessarily had an adverse impact upon unionization in such other plants. We have heretofore observed that employer action which has a foreseeable consequence of discouraging concerted activities generally does not amount to a violation of § 8(a)(3) in the absence of a showing of motivation which is aimed at achieving the prohibited effect.

*Id.* at 276, 85 S.Ct. at 1003 (citation omitted).

At argument, counsel for the Board specifically admitted that there was "no evidence on the record to show that there was a motive of discouraging unionization at other plants. There was no allegation of that in this case and no effort to prove it." In the absence of anti-union animus, the Board has thus conceded that it cannot succeed under the *Darlington* test.

Instead, the Board attempts to bring this case within the "runaway shop" exception to *Darlington.* The Supreme Court noted that its holding would not apply where the employer "transfer[s] its work to another plant or open[s] a new plant in another locality to replace its closed plant." 380 U.S. at 272–73, 85 S.Ct. at 1001. The finding of the Board that work was transferred from Sharon to Brookhollow II is not, however, supported by substantial evidence.

Our reading of the record indicates that instead of a transfer of work to Brookhollow II, the closing of Sharon represented an elimination of production. The demand for the product made out of the potato pellets manufactured at Sharon and Brookhollow II was decreasing throughout the period that the Sharon plant was open. Frito-Lay concedes that after the Sharon plant was closed, there was a temporary and insubstantial increase in the production of potato pellets at Brookhollow II. The increase, however, does not rise to a level sufficient to establish a "runaway shop." Moreover, counsel for the Board admitted at argument that the ALJ had been inadvertently misled by an earlier General Counsel brief in his finding that "after the Sharon plant was closed, the Dallas plant ran all three of its production lines in producing Muncho Pellets." In fact, both before and after the closing of Sharon, Brookhollow II ran only two production lines, though a third line was available.[4] The record simply does not support any finding of a transfer of work to Brookhollow II upon the closing of the Sharon plant.

■ The determination by the Board that the plant closing was a section 8(a)(3) violation is not supported by the record and will not be enforced. The Board conceded that there was no record of anti-union animus in closing the plant, and there is insufficient evidence to support the claim of a runaway

---

4. Before the Sharon plant was opened in September 1974, Brookhollow II had been operating all three of its lines in the production of the potato pellets. When it opened Sharon, Frito-Lay closed down one of the three lines at Brookhollow II.

shop exception to *Darlington*. Therefore, we need not reach the issue (the one which dominated the Board's analysis) of whether Frito-Lay had an economic motivation for the closing of Sharon.

Even were we to agree with the Board that a section 8(a)(3) violation could be supported by the facts, we would not enforce the remedy ordered. The Board ordered the restoration of the status quo ante, that is, reopening the Sharon facility, restoring the production facility, and recalling the terminated employees with back pay for the time they were wrongfully discharged.

The Supreme Court in *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940) cautioned that "[t]he Act is essentially remedial. It does not carry a penal program declaring the described unfair labor practices to be crimes." More recently, the Seventh Circuit in *NLRB v. Townhouse TV and Appliances, Inc.*, 531 F.2d 826, 830 (7th Cir. 1976) noted: "In line with the Act's essentially remedial rather than penal purpose, Board orders may not be punitive or confiscatory and must be reasonably adapted to the situation that calls for redress."

By ordering reopening of the plant with back pay to the terminated employees, the Board has ignored this limitation. In argument, Frito-Lay estimated that the cost of awarding back pay to the employees would exceed one million dollars. Further, there was no dispute by the Board that the plant was being run at an economic loss when it was closed in June, 1975. Yet the Board would have this plant reopened at an estimated operating loss of several hundred thousand dollars to the company a year. The *Darlington* Court was aware of the potential for hardship in the absence of its strict standards on plant closings noting that this is "an area which trenches . . closely upon otherwise legitimate employer prerogatives." 380 U.S. at 276, 85 S.Ct. at 1003.

## SECTION 8(a)(5) VIOLATIONS

■ The Board found that Frito-Lay violated section 8(a)(5) by refusing to bargain in good faith with the Union. We find that there is substantial evidence in the record to support the finding of pervasive and extensive pre-election campaign violations sufficient to support the Board's bargaining order.

■ *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), established a tripartite scheme for the imposition of bargaining orders. First, in exceptional cases with outrageous and pervasive unfair labor practices which preclude the possibility of holding a fair election, the Board may issue a bargaining order even absent a showing that the union had a card majority. Second, the Board may issue a bargaining order in cases of less serious or less pervasive unfair labor practices upon a showing that the union once had a card majority even if the majority has now dissipated where the unfair labor practices "undermine[d] majority strength and impede[d] the election processes." Finally, where there has been a showing only of minor unfair labor practices which have minimal impact on the election process, no bargaining order will issue at all. *Id.* at 613–16, 89 S.Ct. at 1940.

The Board here rested on the second branch of *Gissel* but claimed it had a sufficient record of pervasive and outrageous unfair labor practices to proceed under the first one as well. Since the record demonstrates that the Union had obtained a card majority by the time it made a demand for recognition on February 7, 1975, we need not decide whether the Board had sufficient evidence to sustain a bargaining order under the first branch of *Gissel*.

The record of pre-election unfair labor practices has been reviewed above. It demonstrates that Frito-Lay engaged in unlawful interrogations, threats of discharge or other types of reprisal, creation of the impression of surveillance, implementation of a wage increase, and threats to close the plant if the employees voted for the union. There is substantial evidence to support the Board's finding that there were "unfair labor practices sufficiently serious and perva-

sive to have the tendency to undermine majority strength and impede the election processes." Thus, *Gissel* authorizes the issuance of a bargaining order. *See NLRB v. Juniata Packing Co.,* 464 F.2d 153 (3d Cir. 1972).

### THE REMEDY

We concur in the Board's findings of violations of sections 8(a)(1) and (5). We note that at this time, the Sharon facility is not in operation but has been placed in "mothballs." Because of our holding that the plant is not required to be reopened, our enforcement of the Board's bargaining order is necessarily contingent. That part of the Board's order which requires the reopening of the Sharon plant and the reinstatement of the employees with back pay will not be enforced. In the event that Frito-Lay reopens Sharon, the Board will, of course, be required to reexamine the conditions as they then exist as relating to the obligation to bargain in that context.