HUNTER DOUGLAS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

HUNTER DOUGLAS, INC., Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner.

Nos. 85–3711, 86–3010.

United States Court of Appeals, Third Circuit.

Argued July 22, 1986.

Decided Nov. 6, 1986.

Rehearing and Rehearing En Banc Denied Dec. 2, 1986.

Bruce P. McMoran (argued), William A. Behan, Norris, McLaughlin & Marcus, Somerville, N.J., for petitioner-cross-respondent, Hunter Douglas, Inc.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, Marc B. Seidman (argued), Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross-petitioner, N.L.R.B.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Before us is a petition for review by Hunter Douglas, Inc. from a decision and order of the National Labor Relations Board and a cross-application by the Board for enforcement of its order. The portion of the order contested by Hunter Douglas involves the Board's determination that Hunter Douglas' discharge of most of the second-shift employees at its Maywood, New Jersey plant violated sections 8(a)(1) and (3) of the Labor Management Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1), (3), and that Hunter Douglas' questioning of employee Victor Nunez violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).

### I.

#### Facts

Hunter Douglas manufactures window coverings and distributes both components for window coverings and window covering manufacturing equipment to fabricators and assembles the coverings itself. In the

United States, it operates plants in Maywood, New Jersey; Dallas, Texas; Ontario, California; and Kent, Washington. The present case involves its actions at the Maywood plant.

During the summer of 1984 that plant operated on two shifts, with 63 employees on the first shift and 42 employees on the second. In August 1984, an employee informed Jose Lugo, the business agent of Local 404 of the United Electrical, Radio & Machine Workers of America, that Maywood employees were seeking to form a union. Subsequently, there were four meetings of plant employees at the union's offices. The first, on August 29, 1984, was attended by six employees. Later meetings on September 15 and 29 and October 20 were attended by small but increasing numbers of employees. During this period, employees were also distributing union leaflets at the plant. At the fourth meeting, union authorization cards were distributed, and, by October 24, 1984, 73 signed authorization cards had been obtained, 36 from first-shift employees and 37 from second-shift employees.

In late August or early September 1984, John Santalla, the Maywood plant manager, received an anonymous letter mentioning the names of several employees who were trying to organize a union. Santalla then created employee committees, which he met with on September 18, 20 and 27 and October 5 and 17 in the plant cafeteria on working time. At the meetings, employees complained of working conditions, such as problems with the heating system, air conditioning, bathrooms, and cafeteria. Santalla said he would try to resolve these problems. The employees also mentioned the possibility of receiving more pay. Santalla replied that the company was trying to initiate an incentive pay plan. Medical insurance was also discussed. At the third meeting, Santalla asked each of the employees whether their previous employer had had a union, to which some responded that it had and others that it had not. At the fourth meeting, Santalla distributed a list of proposed shop rules for the committee's consideration. One of the rules pro-hibited solicitation of employees if either the soliciting or the solicited employee was on working time. Another of the rules prohibited distribution of handbills and literature in plant working areas.

In October 1984, Santalla asked a machine operator, Victor Nunez, who went to Santalla's office to get a band-aid, whether it was true that Nunez wanted to join the union. Nunez replied "John, you know that I promised you that I do not want to know anything about unions, and I am not going to join any unions." App. at 683. Santalla then told Nunez no one else was to know about the conversation. A second conversation occurred in the area of the restrooms. Santalla said that he wanted to ask Nunez a confidential question and inquired whether it was true that the employees "were trying to get the Union back in place." App. at 684. Nunez replied, "I promised you that I wasn't going to get into a union, and I don't want to talk about it anymore." App. at 684.

On October 24, 1984, Hunter Douglas discharged 35 of the 42 second-shift employees and the second-shift supervisor. It is the General Counsel's position that the company's motive in discharging the second-shift employees was to inhibit union activity.

Hunter Douglas, on the other hand, argues that these firings resulted from legitimate business reasons stemming from its strategy to cease all work for retail customers. Even before the events at issue, Hunter Douglas had sold its products primarily through independent fabricators. For approximately 90 percent of its window coverings, Hunter Douglas would produce the components but then distribute them to its network of fifty to sixty fabricators who were responsible for assembly and retail sales. In the spring and summer of 1984, Hunter Douglas decided to direct all orders through its fabricator network. In August 1984, it advised retail customers that after August 31, 1984 all orders should be directed to its fabricators.

Hunter Douglas claims that it realized this strategy would give it excess production capacity, and that in spring 1984 it began to plan ways to reduce that capacity. Between March and July 1984, it reduced management personnel by 50%. It made similar cuts in space requirements and inventory during summer and fall 1984. Hunter Douglas claims that it would have had reduced manufacturing manpower needs at the Maywood plant in early September 1984, but that it was able to stave off a long-planned reduction in manufacturing workers at the Maywood plant because of orders from J.C. Penney, one of its largest fabricators. Penney had oversold its capacity and sought production assistance from Hunter Douglas the first week in September.

On October 18, 1984, O.B. Kelley, Hunter Douglas' Vice President of Sales and Marketing, learned that Penney would place no more orders with Hunter Douglas. Kelley informed George Shouldis, Vice President and General Manager of Hunter Douglas. On October 23, 1984, the loss of the Penney orders was confirmed. That same day Shouldis instructed John Brown, Director of Manufacturing, to develop a plan to reduce manpower. That same day, Brown, after consultation with Santalla, recommended to Shouldis that the second shift be eliminated. On the next day, October 24, 1984, with no notice, 35 of the Maywood plant's 42 second-shift employees and the second-shift supervisor, Jose Algarin, were informed of their discharge. Hunter Douglas explains that the dismissal without notice was effected to spare its employees from feelings of "unrest" and "discomfort". App. at 795. Local 404 formally demanded recognition from Hunter Douglas on October 29, 1984.

## II.

### Proceedings

Local 404 filed three unfair labor practice charges against Hunter Douglas, which were consolidated in a complaint issued by the Regional Director. Following a hearing, the Administrative Law Judge found, inter alia: that Hunter Douglas had violated sections 8(a)(1) and (2) of the Act by establishing committees, soliciting grievances, granting benefits and promulgating prohibitions on solicitation and distribution, all as a means of discouraging union organization; and that there was not sufficient evidence to show that Algarin, the second-shift supervisor, had been discharged for his refusal to commit unfair labor practices.

With respect to the activities at issue here, the ALJ dismissed the allegation that elimination of the second shift was an unfair labor practice. The ALJ found: "Respondent [Hunter Douglas] had knowledge of the Union's activities, Santalla displayed animus towards the Union and the timing of the discharges was such that they occurred during the Union campaign." App. at 40. He stated that although 90% of the second-shift employees had signed authorization cards, the discharges occurred before Hunter Douglas was aware of the signing of the cards and before Local 404 demanded recognition. The ALJ stated it was "questionable", but did not decide whether the General Counsel made a *prima facie* showing that protected conduct was a motivating factor in the decision to eliminate the second shift. App. at 40. He found no violation had occurred because he concluded that Hunter Douglas would have eliminated the second shift even in the absence of the protected conduct.

The ALJ also concluded that the questioning of Victor Nunez about union activities was not coercive under the totality of the circumstances and therefore was not an unfair labor practice. Noting that Nunez was not summoned to Santalla's office on the first occasion and that the two met casually near the restrooms on the second occasion, the ALJ found that Santalla's inquiries were the kind of "casual questioning concerning union sympathies" permitted by the Act. App. at 39 (quoting *Graham Architectural Products Corp. v. NLRB*, 697 F.2d 534, 541 (3d Cir.1983)).

Only the General Counsel filed exceptions to the ALJ's decision. The Board

affirmed the ALJ's rulings, findings, and conclusions except with respect to the discharge of the second shift and the interrogation of Nunez. *Hunter Douglas,* 277 NLRB No. 123, slip op. at 7 (Dec. 23, 1985). The Board held that the ALJ's analysis of the discharge of the second shift was faulty because it failed "to consider record evidence that demonstrates that the second shift was selected for layoff in order to defeat the union campaign." *Id.* at 3. Drawing different inferences from the facts on record, the Board concluded that the General Counsel made a prima facie case that union animus was a motivating factor in the layoff of second-shift employees, and that Hunter Douglas failed to show by a preponderance of the evidence that those employees would have been laid off in the absence of union activity and animus. *Id.* at 7. It thus held that the discharge of its second-shift employees violated sections 8(a)(1) and (3) of the Act.

The Board also rejected the ALJ's conclusion that Santalla's questioning of Nunez was not coercive. The Board stressed that Santalla told Nunez the inquiries were confidential, that the questions had no legitimate purpose, and that Santalla was a plant manager who had conducted the interrogation in a calculated fashion. *Id.* at 6–7. The Board, therefore, held that Santalla's questioning of Victor Nunez on two occasions violated Section 8(a)(1) of the Act because it tended to interfere with the exercise of employees' protected rights. *Id.* at 7.

### III.

#### Standard of Review

We must sustain the Board's findings of unfair labor practices if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–91, 71 S.Ct. 456, 463–66, 95 L.Ed. 456 (1951); *Graham Architectural Products Corp. v. NLRB,* 697 F.2d 534, 537 (3d Cir.1983). Similar deference is granted the Board's inferences from facts which, if supported by substantial evidence, may not be dis-

placed even though this court acting *de novo* might have reached a different conclusion. *Universal Camera,* 340 U.S. at 488, S.Ct. at 464; *Herman Brothers, Inc. v. NLRB,* 658 F.2d 201, 209 (3d Cir.1981); *NLRB v. Garry Manufacturing Co.,* 630 F.2d 934, 937 (3d Cir.1980).

Here, the Board disagreed with the ALJ. Hunter Douglas contends that this should subject the Board's findings to stricter scrutiny by this court. *See Eastern Engineering & Elevator Co. v. NLRB,* 637 F.2d 191, 197 (3d Cir.1980). *See also Albritton Communications Co. v. NLRB,* 766 F.2d 812, 817 (3d Cir.1985), *cert. denied,* ——— U.S. ———, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986) ("When, as here, the Board rejects certain findings made by an ALJ, this 'substantial evidence' standard is cast in a special light"). The Board, on the other hand, argues that when the differences between the Board and the ALJ stem solely from different inferences from the overall record evidence, we are to attach no special weight to the ALJ's contrary conclusions, since it is the Board's decision that is under review. *See Stein Seal Co. v. NLRB,* 605 F.2d 703, 706 (3d Cir.1979); *NLRB v. Duquesne Electric & Manufacturing Co.,* 518 F.2d 701, 704–05 (3d Cir.1975).

This issue was discussed in our in banc decision in *Hedstrom Co. v. NLRB,* 629 F.2d 305 (3d Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981), where we stated:

[T]he Board is not in any way inhibited by inferences drawn by the ALJ. To the contrary, the authority to draw legitimate inferences from proven facts is exclusively the Board's, not the ALJ's or the court on review of the Board's order. Indeed, we have consistently held that "the Board has the power to draw different conclusions from evidentiary facts" presented to the ALJ, including conclusions that directly contradict those reached by the ALJ. (citations omitted). If more than one inference may be drawn from a given set of facts, therefore, the

conclusion of the Board will control unless it is unreasonable.

*Id.* at 316.

In this case, the Board did not make credibility findings that differed from the ALJ. Instead, the Board exercised its authority to draw "legitimate inferences from proven facts." We must therefore review its findings under the generally applicable substantial evidence standard. *See Garrett Railroad Car & Equipment, Inc. v. NLRB*, 683 F.2d 731, 739–40 (3d Cir.1982).

## IV.

### Discharge of the Second-Shift Employees

#### A. *Prima Facie Case*

In determining whether a discharge of employees constitutes an unfair labor practice under sections 8(a)(1) and (3) of the Act, the General Counsel bears the initial burden of making a *prima facie* showing by a preponderance of the evidence that protected conduct was a motivating factor in the employer's conduct. Once the General Counsel demonstrates a *prima facie* case, the burden shifts to the employer to demonstrate that it would have taken the same action even in the absence of protected conduct by the employees. *See NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *Hanlon & Wilson Co. v. NLRB*, 738 F.2d 606, 610 (3d Cir.1984); *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

Although the ALJ made no specific finding whether a *prima facie* case had been made out, the Board explicitly stated as a conclusion of law that the General Counsel had established a *prima facie* case. Hunter Douglas argues that there is no substantial evidence to support this conclusion. In essence, its argument is that a *prima facie* case depends on a showing that the discharge of the second-shift employees was motivated by antiunion animus. It argues that such a showing was not made because

there was no evidence that Shouldis or Brown, the two company officers responsible for the elimination decision, had any knowledge of union activity or harbored antiunion animus towards that activity. Hunter Douglas points to the fact that the first demand for recognition by Local 404 did not occur until October 29, 1984, five days after the second shift's elimination, and it claims that until that demand, union activity was so minimal as to be unnoticeable.

Concededly, attendance at union meetings held prior to the second shift's elimination was not large. The testimony was that six workers attended the first meeting, somewhat more attended the next two meetings, and 11 attended the fourth meeting. Meetings were not, however, the sole extent of union activity. Union literature in both English and Spanish, including 200 leaflets, was distributed in and around the plant in September and October. On October 20, the distribution of union authorization cards began. By October 24, approximately 50% of the workers on the first and second shifts had signed and returned authorization cards.

Hunter Douglas does not contend that plant manager Santalla was unaware of the union activity. His keen interest in that activity, as well as his antiunion animus, is fully substantiated on the record. In September, Santalla questioned second-shift supervisor Algarin about possible union activity by an employee. In September and October, Santalla organized and participated in the employee committee meetings at which the no-solicitation and no-distribution rules which would have precluded union literature were promulgated. After one meeting, Santalla questioned Algarin about an employee who had complained about low pay and Santalla told Algarin, "I don't care what you do, get rid of her. If anybody has anything to do with the Union, she's one of them," App. at 521; *see also* App. at 957–58. Santalla questioned employee Nunez about his union activity twice in October. Most significantly, in October, Santalla instructed Algarin to watch for

union activists in the second shift as Santalla wanted to "get the teeth out of the union." App. at 528.

Hunter Douglas points to direct testimony by Brown and Shouldis that they had no knowledge of union activity. However, Brown also testified that he was always "aware there was a potential for union activity. And from time to time I heard comments, but nothing that I could recall specifically." App. at 860. The ALJ did not find that Brown and Shouldis had no knowledge or union activity. He did find, without further elaboration, that "Respondent [Hunter Douglas] had knowledge of the Union's activities." App. at 40.

It is significant that when Shouldis asked Brown on October 23 to formulate a personnel reduction plan, Brown then consulted with Santalla, who was well aware of the increasing union activity. Santalla admitted in his testimony that he recommended to Brown that the second shift be eliminated. App. at 976. Brown in turn relied on Santalla's recommendation in suggesting the second shift's elimination to Shouldis. App. at 878. Where, as here, a supervisory employee has knowledge of union activity, an inference that he has communicated that knowledge to his superiors is permissible. See Texas Aluminum Co. v. NLRB, 435 F.2d 917, 919 (5th Cir.1970).

■ In some cases, the courts have upheld the Board's inferences of knowledge of union activity solely on the basis of the timing and nature of the discharge despite company claims that no management officials were aware of union activity. See NLRB v. Wal-Mart Stores, Inc., 488 F.2d 114, 117 (8th Cir.1973); NLRB v. Long Island Airport Limousine Service Corp., 468 F.2d 292, 295–96 (2d Cir.1972); NLRB v. Sequoyah Mills, Inc., 409 F.2d 606, 609 (10th Cir.1969). In this case as well, a similar inference is permissible, not only from the plant manager's knowledge but from the timing and nature of the discharge.

The company's abruptness in implementing Brown's recommendation is significant. Employees were given no notice of their discharge and were simply informed when they arrived at work on October 24 that they no longer had jobs. This abrupt discharge coincided with the culmination of Local 404's drive to obtain union authorization cards. The only explanation offered for the lack of any notice prior to discharge, Shouldis' testimony that, "I think decisions as dramatic as this require immediate implementation. I think to drag along only causes unrest and discomfort for all concerned," App. at 795, is implausible.

Moreover, the manner of implementing the abrupt layoff departed from the company's past practice of reassigning employees to other shifts. When Hunter Douglas eliminated its third shift in 1983, it used the opportunity to "weed out some of the deficien[t]" employees, by reassigning others to the first two shifts. App. at 797. In 1984, a layoff was spread through the first and second shifts, using the same weeding out procedure. App. at 796–97. Although Hunter Douglas retained some second-shift employees with special skills, it has never suggested that it employed the same type of weeding out process that it had previously employed, and instead discharged almost all of the 42 second-shift employees in one fell move. The company cannot rationalize its action at the Maywood plant by its subsequent decisions to eliminate the second shift at the Kent, Washington plant in October 1984 and at the Ontario, California plant in January 1985.

Hunter Douglas contends that other evidence dispels any inference of discriminatory motive in the second-shift's elimination. It argues that because almost equal numbers of union cards were obtained from each shift, 36 from the first shift and 37 from the second shift, both shifts had relatively equal amounts of union activity. By looking only at the numbers, Hunter Douglas ignores the relevant percentages. Because the first shift had 63 employees while the second shift had only 42, only 56% of the first shift but over 90% of the second shift signed union cards. Moreover, the second-shift employees were more

active in engaging in union activity. All six employees who attended the initial union meeting were from the second shift as were a majority of attendees at each of the subsequent meetings. Second-shift employees were primarily involved in the distribution of literature and union cards. Most important, Santalla's activities were concentrated on the second shift. Second-shift supervisor Algarin testified that Santalla said "that he was aware that some of the employees were trying to organize a union and that he believed that it was coming from [the second] shift." App. at 527.

Hunter Douglas also emphasizes that it retained ten union supporters from the second shift. Even if true, this does not change the fact that the majority of the second shift, which was the focus of union activity, *was* laid off. Moreover, courts have held that it is "irrelevant that some union sympathizers were not laid off, when the layoffs were meant to chill union activity," *NLRB v. Rain-Ware, Inc.*, 732 F.2d 1349, 1355 (7th Cir.1984). *See also Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175 (6th Cir.1985).

 We have previously stated that "because there often is no direct evidence of antiunion motivation, the Board may rely on circumstantial evidence to prove such intent." *NLRB v. Scott Printing Corp.*, 612 F.2d 783, 787 (3d Cir.1979). *See also NLRB v. Treasure Lake, Inc.*, 453 F.2d 202, 205 (3d Cir.1971). In this case, there was sufficient circumstantial evidence to support the reasonable inferences made by the Board. Even if Brown and Shouldis were not personally aware of the concentrated union activity that had taken place in the plant in the two months before elimi-

nation of the shift, since Santalla had both knowledge of that activity and antiunion animus and his recommendation played a part in the ultimate decision, Hunter Douglas may be held to have acted out of antiunion animus. Otherwise, companies will be able to accomplish impermissibly motivated discharges without penalty through the simple expediency of dividing their personnel functions and insulating top management from common knowledge. *See Allegheny Pepsi-Cola Bottling Co. v. NLRB*, 312 F.2d 529, 531 (3d Cir.1962). Accordingly, we hold that there was substantial evidence to support the Board's conclusion that the General Counsel had made out a *prima facie* case.[1]

### B. *The Company's Articulated Business Reason*

Hunter Douglas also argues that even if the General Counsel established a *prima facie* case, the ALJ correctly found that Hunter Douglas proved that the discharge of the second shift would have occurred even in the absence of any union organizing conduct. The company bases this claim on evidence of its overall policy of work reduction and reorganization, the unexpected termination of orders by J.C. Penney, and its "sharply" reduced production needs after the layoff.

The Board did not reject Hunter Douglas' position that some form of work reduction would have occurred because of the change in its marketing strategy. It concluded, however, that Hunter Douglas failed to sustain its burden of proving that the timing and nature of the reduction that did occur resulted from business reasons, as it claimed, rather than from an attempt

---

**1.** Hunter Douglas refers us to the findings of the district court of the District of New Jersey on the Regional Director's petition for injunctive relief under section 10(j) of the Act, 29 U.S.C. § 160(j), as support for its claim that no substantial evidence supports the Board's findings. The district court granted partial injunctive relief, but also held that there was not reasonable cause to believe that the elimination of the second shift violated the Act. The court did not believe that "all the discharges complained of were the product of [Hunter Douglas'] anti-union animus" and was "satisfied that [Hunter Douglas'] evidence on its defense of economic necessity overcomes the presumption in favor of injunction." App. at 101. The 10(j) proceeding is not under review, and hence cannot affect our determination. Because we do not rely on those materials, it is unnecessary to address the Board's motion to strike them from the appendix.

to discourage unionization. *See Transportation Management,* 462 U.S. at 400–03, 103 S.Ct. at 2473–75.

In reaching this conclusion, the Board relied on the "abruptness of the layoff, coming as it did at the time of the union drive," and the fact that "this layoff deviated from previous layoffs, in that it involved elimination of an entire shift rather than a reduction in the number of overall employees based on individual considerations." *Hunter Douglas,* 277 NLRB No. 123, slip op. at 5–6.

■ The mass of economic data that the company lays before us does not convince us that there is not substantial evidence to support the Board's decision. Hunter Douglas claims it had sharply reduced production needs, but in fact it took some time for production to decrease. The company's average incoming orders for the first three weeks of November were substantially equivalent to the company's average in October. Although the number of orders then declined for the two weeks near the Thanksgiving holiday, in December they returned to their approximate October level. App. at 290–91. The plant continued to be busy after the layoff, and the remaining first-shift workers were given the opportunity of working overtime "[j]ust about every day" until two to three weeks before Christmas. App. at 636–37. This tends to refute Hunter Douglas' argument that the loss of J.C. Penney orders required immediate reduction of the workforce. In fact, in its opinion the Board noted that Shouldis testified that Penney's termination of orders "was not a loss" because Hunter Douglas did not rely on Penney's unsolicited business, and that Brown testified that the layoff was not "precipitated by any one event." *Hunter Douglas,* 27 NLRB No. 123, slip op. at 4; *see also* App. at 821, 847–48.

The Board was not obliged to credit Hunter Douglas' contention that lower productivity on the second shift was the cause of its elimination, particularly in light of the layoff of workers who had been commended by Santalla for their productivity

and one worker who had participated in training of third-shift employees. App. at 454, 501–02. Based on the record that had been adduced before the ALJ, and without overturning any of his credibility determinations, the Board concluded that "the layoff of second-shift employees would not have happened as it did were it not for the desire of the Respondent to impede union activity." *Hunter Douglas,* 27 NLRB No. 123, slip op. at 6. There was substantial evidence to support that determination.

## V.

### *Interrogation of Nunez*

Hunter Douglas also challenges the Board's determination that Santalla's interrogation of employee Victor Nunez tended to interfere with the exercise of employees' protected rights and therefore was in violation of Section 8(a)(1) of the Act. In *Graham Architectural Products, Corp. v. NLRB,* 697 F.2d 534, this court stated:

> An employer's questioning becomes coercive and runs afoul of section 8(a)(1) when it "suggests to the employees that the employer may take action against them because of their pro-Union sympathies...." Although the Board need not show that the employer's interrogation actually had any coercive effect, the questioning must reasonably have tended to coerce under the circumstances.

*Id.* at 537 (quoting *Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 65 (3d Cir.1978)). *See also NLRB v. Keystone Pretzel Bakery, Inc.,* 696 F.2d 257, 259–60 (3d Cir.1982) (in banc); *Hedstrom Co. v. NLRB,* 629 F.2d 305, 314.

Here, Santalla questioned Nunez during the first week of October when Nunez had gone to Santalla's office to get a band-aid. Nunez testified that Santalla

> wanted to know if it was true that I wanted to get into the Union again. I said, "John, you know that I promised you that I do not want to know anything about unions, and I am not going to join any unions." He said ... that matter was

something between he and I, and that no one else was to know about it. App. at 683. Although Hunter Douglas argues that this was the kind of "casual questioning concerning union sympathies" which is permissible under the Act, see *Graham Architectural Products*, 697 F.2d at 541, the Board noted Santalla's direction that the conversation be kept confidential, which suggests to us that the questioning was more than "casual". Although Nunez' answer implies a promise made and no need to discuss the matter again, Santalla did question Nunez again, this time near the restrooms. Nunez testified that Santalla:

> told me that he wanted to [ask] a confidential question of me. That he wanted to know if it was true that we were trying to get the Union back in the place. I told him—I promised him—"I promised you that I wasn't going to get into a union, and I don't want to talk about it anymore."

App. at 684.

██ Such repeated confidential questioning was unlikely to be taken as "casual" by the employee. As the Board pointed out, Santalla had no legitimate purpose for the questions. We find substantial evidence to support the Board's findings regarding the interrogation in the nature of the questions, their repetition, their lack of any legitimate purpose, Santalla's high management position, and his emphasis on their confidentiality.

## VI.

### Conclusion

Hunter Douglas does not oppose the Board's request for enforcement of the portion of its order based on its findings that the company violated Sections 8(a)(1) and (2) of the Act by forming employee committees and convening meetings of the committees to solicit and resolve grievances, and that the company violated Section 8(a)(1) by granting benefits, remedying grievances, and promulgating a no-solicitation and no-distribution rule. Because we have found that substantial evidence supports the Board's other findings, we will enforce the entire order of the Board and deny Hunter Douglas' petition for review.

WEIS, Circuit Judge, dissenting.

The decision of the Board in this case illustrates the importance of the burden of proof to the resolution of a controversy. The Board's opinion also demonstrates a curious ambivalence in assessing the evidence required of the parties to meet their respective burdens.

Review of the record here must be more searching than in the usual case where the Board and the ALJ agree on their findings. Although the "substantial evidence" test applies in both instances, that "standard is cast in a special light" when "the Board rejects certain findings made by an ALJ." *Allbritton Communications Co. v. NLRB*, 766 F.2d 812, 817 (3d Cir.1985). The evidence supporting a determination may be less substantial when an ALJ "who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951). *See also Eastern Engineering & Elevator Co., Inc. v. NLRB*, 637 F.2d 191, 197 (3d Cir.1980).

This caution is particularly applicable when the narrative facts found by the ALJ are grounded on evaluations of oral testimony. As the Board explained in *Standard Dry Wall Products, Inc.*, 91 N.L.R.B. 544, 545 (1950), the ALJ's findings based on credibility will not be disturbed unless a "clear preponderance of all the relevant evidence" demonstrates error. In my judgment, it is unrealistic to assume that an ALJ's choice of inferences from narrative facts is not similarly affected to a substantial degree by credibility judgments made in the course of hearing testimony.

In this case, the Board concluded that General Counsel had met the burden of establishing a prima facie case, although the ALJ had been extremely dubious on that point. The ALJ did determine that

Hunter Douglas had met its burden of proving an economic reason for the layoff. The Board however found to the contrary despite largely undisputed evidence, significant portions of which were statistical and documentary.

In mixed motive discharge cases, General Counsel must establish by a preponderance of the evidence that the employee's protected conduct "was a substantial or a motivating factor in the discharge." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). Although the General Counsel's burden has been labeled a "prima facie" case, this use of the term should be distinguished from its application in other contexts.

In a jury trial, the plaintiff makes out a prima facie case if, assuming the truth of his evidence, a claim has been established. In a Board hearing, however, the assumption of truth criterion plays no part in the evaluation of General Counsel's "prima facie" case. Only if he meets the burden of presenting truthful evidence that supports his position by a preponderance has he made out his case. Thus, if the ALJ finds that the testimony produced by the General Counsel is not worthy of belief, a prima facie case has not been established, even if that evidence would have been committed to the fact finder in a jury case.

If General Counsel successfully meets his burden of persuasion, the employer nevertheless is not liable if it proves that the discharge would have occurred in any event. Rephrased, despite the fact that an employee's protected conduct was a substantial or motivating factor in his discharge, the employer is not subject to reinstatement or back pay orders if it can prove that the discharge would have occurred regardless of the forbidden motivation. The employer bears the burden of proving this affirmative defense. *NLRB v. Transportation Management Corp.*, 462 U.S. at 401, 103 S.Ct. at 2474.

In the case at hand, the Board found that General Counsel had met his burden based on inferences it drew from the testimony.

These included the fact that Santalla, the plant manager, knew that union organizing efforts were underway on the second shift. Moreover, the company deviated from its previous practice of considering individual seniority or qualifications in spreading the layoffs between shifts. The Board also found it "not credible" that Shouldis and Brown, the company officers, would accept Santalla's recommendation and act "with such great haste."

The Board's emphasis on the abruptness of the layoff fails to consider that a reduction in force had been contemplated for some time and that other steps had already been taken to change the character of the operation at the Maywood Plant.

Substantial evidence indicates that the company was aware of the interest of some employees in joining a union. Although the employer did decide to lay off the second shift, it followed its previous practice to the extent of retaining ten employees because of their special skills. Significantly, these employees were union adherents, but the Board failed to mention this fact or to note that none of those on the first shift who signed union authorization cards were discharged.

Of the total who had signed union cards, thirty-six employees were from the first shift and thirty-seven were from the second. That a larger percentage of the second shift had signed cards is of no importance. Representation elections are determined by absolute numbers, not percentages.

In short, the Board strained mightily to find that General Counsel had met his burden. Yet, it was curiously reluctant to credit undisputed facts which the company offered to prove that the employees would have been discharged in any event.

The company relied on a number of factors:

1. Lower productivity of the second shift compared with the first was documented in statistical evidence showing that the gap was widening in the period from August through

October 1984. In addition, Jose Algarin, the supervisor for the second shift who was also discharged, conceded that he had received complaints from Santalla about productivity. The ALJ observed that Algarin "appeared to me to be a credible witness."

2. Larger management representation was available during the first shift. The record reflects that the first shift hours were 7:00 a.m. to 3:30 p.m. (App. at 144), when management personnel would be expected to be present in greater numbers than in the later hours of the second shift.

3. Security considerations were expected to be less during the daylight hours of the first shift.

4. Indirect costs would be reduced, for example electricity used to light the work stations and run the equipment would not be required for the second shift hours.

The Board listed these factors but dismissed them, arguing that they failed to explain why the company had deviated from its previous practice of considering individual seniority and qualifications. As noted earlier, the Board overlooked the fact that some employees had been retained because of special qualifications. Furthermore, the Board ignored the evidence that since becoming director of manufacturing in May, 1984, Brown met the need for workforce reductions at three of the employer's plants by eliminating a shift.

By failing to answer these specific points, the Board seems to concede, implicitly at least, that the company had articulated adequate reasons for laying off some employees, if not particularly those on the second shift. The record compels that conclusion.

Undisputed evidence shows that early in 1984 the company had decided to expand its policy of using a network of independent fabricators to assemble blinds. Substantial reductions in management personnel, inventory, and amount of floor space had already taken place before August, when the company announced that further referrals of work to fabricators would be made. That decision made reductions in the number of employees inevitable.

The record demonstrates, again without contradiction, that in August, Shouldis and Brown discussed the necessity of reducing the work force. No employees were discharged then because the J.C. Penney business unexpectedly arrived at the point when the company otherwise would have implemented the cutback.

The records of Hunter Douglas's operations in the months following the October discharges amply demonstrate that economic pressures were the actual motivation for the reduction in manpower. Although J.C. Penney sent in a few more orders after October 24, the volume of other new orders continued to decline. The company has not recalled any of the employees who were discharged in October, nor has it hired new employees to replace those lost by normal attrition.

Furthermore, Hunter Douglas did not find an increase necessary in its overtime assignments after the October discharges. In August overtime expenses were $5,280. That sum increased in September to $11,521 when the J.C. Penney orders came in, and it fell to $5,550 in October. In the first month after the October discharges, the overtime dropped to $2,199, rose to $5,807 in December, and declined to $103 in January.

In the face of this uncontroverted data, it is difficult to understand how the same Board that piled inference on inference drawn from largely circumstantial evidence to find that General Counsel had met its burden, could then conclude that the company's factual data did not satisfy the burden of establishing an independent business justification for the reduction in force.

Like the ALJ, I am skeptical that General Counsel presented a prima facie case. Accepting *arguendo* the Board's determination that the burden had been met, however, I am persuaded that application of the same test to the employer's claim cannot

but result in a conclusion that it was the much stronger of the two.

The weakness of the Board's decision is perhaps most evident when an attempt is made to ferret out just what the Board thinks the employer should have done to meet its burden of proof. There is some indication, although not clearly stated, that the company should have followed its previous practice in laying off those with less qualifications and seniority. The Board, however, cites no authority for freezing a company's procedures when legitimate business conditions justify a change. To the contrary, in *Hardwick Co., Inc.*, 263 NLRB No. 47 (1982), the Board refused to find a violation of the Act where the employer, during an organizing campaign, changed its method of selecting employees for layoff from a subjective merit system to a purely seniority-based one.

Moreover, I suspect that if that previous practice had been followed, more union adherents would have been laid off than was the case here. In that event, the Board might well have complained that a more neutral method—perhaps laying off an entire shift without individual discrimination—would have been a permissible way of effecting the necessary reduction in force. One also wonders whether the Board would not be forced by its logic to say that choosing the first shift instead of the second likewise would have been a violation of the Act.

The Board also placed some significance on the timing, implying perhaps that even though a reduction in force was to be expected, it should not have come so soon. Even if the layoff could have been postponed for possibly a month, based on orders received, the Board did not limit its relief to that period of time. Reinstatement and back pay awards result in the employer being required to pay for two full shifts during a period in which, by no

stretch of the imagination, would it have employed a work force of that size.

In short, I conclude that the record does not contain substantial evidence to support the Board's rejection of the employer's affirmative defense,[1] and accordingly I would deny enforcement of the reinstatement order.

Many of the same observations apply to the charge that Santalla's conversations coerced Nunez. We described the legal standards applicable to a claim of this nature in *Graham Architectural Products Corp. v. NLRB*, 697 F.2d 534, 537 (3d Cir. 1983). We noted that, as here, the ALJ was in a better position than the Board to determine the character of the interrogation. Adopting a pragmatic view of the workplace, we observed that supervisors and employees often work closely together and that during the course of the day they may discuss many subjects including unionization efforts. "To hold that any instance of casual questioning concerning union sympathies violates the Act ignores the realities of the workplace." *Id.* at 541.

To make out a violation, General Counsel must establish the necessary element of a tendency to intimidate or coerce. When interrogation occurs under casual circumstances and conveys no direct or implied threat or warning to the employee, the employer's right "to communicate with their employees concerning an ongoing union organizing campaign" comes within the scope of the First Amendment. *Id.* at 541.

I recognize that the test is objective—whether the interrogation "tends" to restrain or coerce rather than actually produces that result, *Frito Lay, Inc. v. NLRB*, 585 F.2d 62, 65 (3d Cir.1978). Nevertheless, it is interesting that at the time Santalla questioned Nunez, he apparently had not joined the union effort. He, however, later signed an authorization card on October 23, 1984. (App. at 212).

---

1. Based on the same record as that before the Board, the district court concluded that the employer had overcome the presumption in favor of a § 10(j) injunction by establishing the defense of economic necessity. The court rejected the Board's contention that there was "reasonable cause" to believe the discharges were caused by anti-union animus.

The ALJ had the opportunity to hear testimony from both Nunez and Santalla, and was thus in a far better position to appraise the effects of the interrogation than the Board. Judgments based on demeanor are particularly important in questions of this nature. The Board failed to provide any satisfactory reason for its refusal to accept the ALJ's findings that the questioning had not been coercive.

In sum, substantial evidence does not support the Board's decision on the coercion issue. The determination not only is contrary to our holding in *Graham Metals*, but also is inconsistent with the Board's own opinion in *Rossmore House and Hotel Employees and Restaurant Employees Union*, 269 NLRB No. 198 (1984). I would deny enforcement of this order as well.